JAMES A. COLLINS AND DOROTHY O. COLLINS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3116–67.   Filed August 27, 1970.

*Justin L. Goldner*, for the petitioners.
*Myron A. Weiss* and *Robert H. Feldman*, for the respondent.

## OPINION

The principal issue in this case is whether petitioners are entitled to a deduction in the year 1962 of $44,299.70 under section 163 and I.T. 3740, 1945 C.B. 109. The cited section allows a deduction for "all interest paid * * * on indebtedness" and I.T. 3740, *supra*, provides

that a cash basis taxpayer may deduct interest paid in advance for a period of 5 years in the year of payment.[2]

The burden was on petitioners to show that the payment in issue, $44,299.70, constituted interest on indebtedness within the meaning of section 163. To do this they must prove that a genuine debt existed between them and the sellers of the property. See *Max Barnett*, 44 T.C. 261 (1965), affd. 364 F. 2d 742 (C.A. 2, 1966), and *Lael Kovtun*, 54 T.C. 331 (1970).

Petitioners won $140,100 in the Irish Sweepstakes in 1962. This case involves their effort to minimize the tax consequences to them of this sudden increase in their income.

They decided to buy income-producing property. A C.P.A., who had represented other sweepstakes winners in their tax matters, was engaged to represent petitioners. He told the real estate agent who was representing the sellers that any property purchased by petitioners would have to be purchased on a purchase contract providing for pre-paid interest. Petitioners, on November 12, 1962, executed a written offer to buy sellers' apartment building and the sellers on the same date executed a written acceptance of that offer "on the terms and conditions therein set forth."

In the offer petitioners offered to buy the apartment building for $168,000, paying sellers the amount above the first-mortgage loan balance and assuming the first-mortgage loan. The amount petitioners had to pay sellers was to be placed in escrow within 45 days. The offer by petitioners was to pay $63,000 cash with the balance to be paid in accordance with the terms of a contract "submitted to escrow by C.P.A." but petitioners' purchase of the apartment building had to "be completed prior to Dec. 31, 1962 and escrow closed or this offer is null and void."

The first-mortgage loan balance was $104,204.86. This meant that according to the offer and acceptance where the total purchase price was to be $168,000, the sum of $63,795.14 was to be paid by petitioners to the sellers and the balance of the purchase price, or $104,204.86, was to be represented by petitioners' assumption of the first mortgage. The sum of at least $63,000 of the $63,795.14 which the sellers were to receive was to be paid to sellers in cash and the balance paid pursuant to the terms of a contract to be submitted by the C.P.A.

It fairly appears that it was understood by petitioners and sellers at the time of the execution of the November 12, 1962, offer to buy and

---

[2] I.T. 3740 was revoked in 1968 by Rev. Rul. 68–643, 1968–2 C.B. 76, which states in part: "I.T. 3740 * * * revoked. However * * * this Revenue Ruling will be applied without retroactive effect to interest prepayments for periods not in excess of five years made prior to November 26, 1968 by taxpayers employing the cash receipts and disbursements method of accounting."

its acceptance that a subsequent contract would be worked out which would give sellers the same cash payment of at least $63,000 but the contract would call for a lower purchase price, lower downpayment, and installment payments with interest over a 5-year period and the prepayment of this interest. It was the C.P.A.'s task to work up the figures to be contained in the contract which would provide for the payment to sellers of at least $63,000 but the contract would recite that part of this amount would be downpayment on the purchase price and part prepayment of interest. The contract of December 12 contains the figures worked up by the C.P.A.

Petitioners rely upon this December 12, 1962, contract reciting the apartment building was being bought by petitioners for a purchase price of $158,800. They point to their obligation in the contract to pay the sellers $19,315 cash downpayment and the balance, or $139,485, in monthly installments of $830, plus interest at 8.4 percent. They argue that the sum of $44,299.70 which petitioners paid the sellers represents the calculation of interest for 5 years at 8.4 percent on $139,485, with a discount of $4,000 for early payment of that interest.

Respondent contends the terms of the purchase as outlined in the December 12, 1962, contract were shams and lacked any economic substance. He argues the calculations in this contract merely represent an arbitrary mathematical performance by the certified public accountant and they have no roots in the basic agreement and understanding between petitioners and sellers of the apartment building and no true indebtedness was created and there was no bona fide interest paid, and what was called prepayment of interest was merely a part of the downpayment.

Between November 12, 1962, and November 23, 1962, the sellers and the C.P.A. held several meetings at which the C.P.A. submitted the figures he had worked out. The figures first submitted were changed by the C.P.A. in subsequent meetings, with the figure representing the downpayment going down and the figure representing interest going up.

The C.P.A. first worked out the amount that would be due under the first mortgage 5 years from the date of purchase after the payments of $827 a month. He determined to use an interest rate of 8.4 percent. The figures he finally worked out were contained in the escrow instructions and the December 12, 1962, contract.[3] He used a different purchase price, a smaller downpayment, and a schedule of monthly

[3] The C.P.A. testified there was another way he could have worked out the figures which he called a trial-and-error method. He said he could have worked backwards or "I could have worked forwards by taking arbitrary figures of $150,000 and working it down, and if it didn't come out equal to the first deed of trust I could have worked what I call empirically by trial and error."

payments with interest over the 5-year period that would, when interest was prepaid, give the sellers a total of at least $63,000 cash.

The C.P.A.'s testimony establishes the fact that the figures he caused to be used in the escrow instructions and the December 12, 1962, contract were completely arbitrary and fictitious. He said neither the petitioners nor the sellers had anything to do with calculating the figures he used. In short, he used figures for purchase price, downpayment, monthly installment payments, interest, and discounts, not based on any agreement or understanding between buyers and sellers. He gives no explanation of why he used an interest rate of 8.4 percent and he frankly stated that the discount of $4,000 (said to be for early payment of interest) was "merely an arbitrary figure." He made the installment payments, $830 a month for 5 years, or $3 more than the first-mortgage installment payments.

Shook, who was the real seller of the property, was indifferent to the terms of the contract so long as the buyer would be obligated to pay sellers $63,795.14. As we have seen, this sum represents the amount of the purchase price ($168,000) stated in the offer and acceptance, above the first-mortgage loan which the buyers were assuming. This is exactly the obligation of the December 12 agreement. By that contract petitioners were obligated to pay $19,315, said to be a cash downpayment, $44,299.70, said to be prepayment of interest, and $3 a month for 5 years, or $180, or a total of $63,794.70 which is a few cents less than the $63,795.14 the petitioners were obligated to pay sellers under the original offer and acceptance of November 12, 1962.

Petitioners paid $19,315 and $44,299.70, or a total of $63,614.70, into escrow and this was turned over to sellers in return for their deed to the C.P.A. as trustee. The C.P.A. collected $830 a month from petitioners, made the monthly payments of $827 under the first mortgage and the monthly $3 payments to sellers for 5 years and then deeded the property to petitioners.

No true indebtedness was created by the December 12 contract. The installment debt and prepayment of interest provisions in the contract of December 12, 1962, were shams. They were completely devoid of economic substance. The certified public accountant merely juggled the figures that were contained in the earlier offer to buy and its acceptance until he arrived at the same result. He used other figures to one of which was affixed a label of "prepaid interest," but the amount of petitioners' immediate payments to the sellers was the same. No genuine debt was created to support the so-called "interest" prepayment.

This case is indistinguishable on principle from such cases as *Knetsch* v. *United States*, 364 U.S. 361 (1960); *Kapel Goldstein*, 44 T.C. 284, affd. 364 F. 2d 734 (C.A. 2 1966); and *Ippolito* v. *Commis-*

*sioner*, 364 F. 2d 744 (C.A. 2 1966), affirming a Memorandum Opinion of this Court, and the numerous cases which hold that amounts claimed as "interest" cannot be deducted where the transaction which gave rise to the claimed deduction was a sham.

The record and testimony establish that no money was actually borrowed from Shook and no debt to the sellers created except for the trivial $180. It was of little consequence to Shook that part of what was paid to him was labeled downpayment ($19,315) and part was labeled interest ($44,299.70) and part was just $3 a month for 5 years ($180). The immediate cash payments to sellers totaled slightly more than the $63,000 he had demanded. He said the C.P.A. told him the provision to pay him $3 a month for 5 years was "To keep the contract legal." It was of some concern to Shook that he would have to report the $44,299.70 as interest income in his 1962 return but he had a rental loss of $52,858.44 that year so his reporting the interest income did not result in tax liability to him that year.

Shook who was the only signer of the November 12, 1962, offer and acceptance and the December 12, 1962, contract to testify said that he did not loan any money to Collins and he did not believe the Collinses owed him $139,000. He said the only way he could sell the property to the Collinses was to agree with the deal set up by the C.P.A. in the December 12, 1962, contract. He said the C.P.A. told him this was being set up in that manner "For a tax saving to Mr. and Mrs. Collins.". He said he did not care because as he stated: "I was merely going to get my amount of money that I had agreed upon." He said later he was somewhat concerned when his auditor told him he had to report the receipt of interest income. He testified that he called the C.P.A. "when I found I had to report supposedly on $40,000-some worth of prepaid interest, and he said it was too late, it was too bad. So I left it at that."

Shook testified that he paid a commission of $10,080 which was 6 percent of the sales price of $168,000. When asked why he didn't pay a sales commission based on a sales price of $158,000, the purchase price recited in the December 12 contract, he said, "I thought it was a sham." In reality, the positions of the parties created by the November 12 offer and acceptance were not changed by the agreement of December 12. The latter agreement was a facade as a loan for the purposes of creating what would appear to be an indebtedness that would support an interest deduction under section 163. It did not appreciably affect the payments to be made by the petitioners as agreed upon in the earlier offer and acceptance agreement except to reduce tax. See *Joseph H. Bridges*, 39 T.C. 1064 (1963), affd. 325 F. 2d 180 (C.A. 4, 1963) ; *Max Barnett, supra;* and *Knetsch* v. *United States, supra.* The true downpayment with respect to the purchase was reflected in the $19,315 called a downpayment plus the so-called interest allegedly

paid on the loan or $44,299.70 or a total of $63,614.70. The "interest" was not compensation paid for the use or forbearance of money as required for the deduction. See *Deputy* v. *Du Pont*, 308 U.S. 488 (1940), and *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552 (1932).

The fact that Shook reported the amount labeled interest in the December 12 contract as interest income to him is not significant—especially since he had a large loss that year. *Lael Kovtun, supra.* The record shows such reporting by Shook was to be part of the transparent pretension that was designed to clothe the payment with the garb of interest. The fact that $3 a month went to Shook under the agreement does not provide the necessary substance for the loan transaction involved. *Max Barnett, supra* at 278.

The substance of a transaction must control over the form. *Gregory* v. *Helvering*, 293 U.S. 465 (1935). We hold the loan agreement and prepayment of interest was a sham and that petitioners are not entitled to the deduction.

Petitioners note that in many of the cases in this area the courts refer to the transactions under question as "shams" or "lacking in business purpose" or "economic substance." They seek to distinguish the instant case from those cases by arguing that the transaction entered into by them was not a "sham" since they were seriously purchasing an apartment house expecting to reap economic gain aside from the tax consequences.

The transaction we find to be a sham is not the acquisition of the apartment house but the prepayment of interest and the loan agreement. We accept the contention that the motivating factor in the purchase of the apartment house was economic gain. It is the terms used to support the deduction of prepaid interest (the loan agreement) which we consider to be a sham. *Ballagh* v. *United States*, 331 F. 2d 874 (Ct. Cl. 1964), certiorari denied 379 U.S. 887. Respondent was right in disallowing the deduction of $44,299.70 as payment of interest.

The second issue involves the deduction petitioners took on their 1962 income tax return in the amount of $4,761 for "Accounting and Legal" expenses. The deduction is made up of $4,511 paid to the C.P.A. and $250 paid to attorney Walker. In his notice of deficiency respondent disallowed all but $300 of the claimed deduction explaining that the disallowed portion ($4,461) "represent[s] a capital expenditure in the acquisition of your rental property."

There is little evidence with respect to the services rendered by attorney Walker for which he was paid $250. Neither Walker nor either petitioner testified. However, what little evidence there is indicates Walker rendered legal services for petitioners with respect to drawing the document for the acquisition of the property. The

payment for such services would be a capital expenditure, representing part of the cost of acquiring income-producing property and would not be allowable as an expense deduction. Sec. 263(a), I.R.C. 1954; sec. 1.263(a)–2(a), Income Tax Regs. *Charlotte M. Douglas*, 33 T.C. 349 (1959).[4] We are of the opinion that the deduction for the $250 payment to attorney Walker should be disallowed.

Section 212(3), I.R.C. 1954, allows as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year "in connection with the determination, collection, or refund of any tax." The issue presented as to the fee of $4,511 paid to the C.P.A. in 1962 is whether it is to be deducted that year as an ordinary and necessary expense under the above statute or whether it is a capital expenditure under sec. 263(a)(1) which denies deduction for "Any amount paid out for new buildings."

The evidence shows the C.P.A. was engaged to minimize petitioners' 1962 income tax as much as possible in their purchase of the apartment building. He rendered tax advice. He assisted in preparing the contract and other documents connected with their purchase of the apartment building in that he computed the figures used therein. His services with respect to drawing the documents by which the property was acquired were efforts to obtain tax advantages for petitioners as distinguished from services such as Walker performed to see that the documents accomplished a legal acquisition. He conferred with the sellers in an effort to have his figures accepted so petitioners would obtain, what he considered, were tax advantages. The advice of the C.P.A. was adopted. The C.P.A. rendered services in preparing petitioners' 1962 income tax return reporting the transaction in the form he had recommended. He acted as trustee, which was part of his tax-saving plan. After 1962 the C.P.A. represented petitioners with regard to their 1962 tax liability before the Internal Revenue Service and aided petitioners in their case in this court.

We are of the opinion that the fee of $4,511 paid to the C.P.A. in 1962 was for all of his services performed in 1962 and subsequent years;[5] that all of the services performed by the C.P.A. were related to tax advice and assistance in tax matters. The said payment of $4,511 in the year 1962 was properly deductible under sec. 212.[6]

To reflect the conclusions reached herein,

*Decision will be entered under Rule 50.*

---

[4] See also *Lucy G. Mason,* T.C. Memo. 1962–100.

[5] No issue of allocation of this fee is presented.

[6] See *Michael J. Ippolito,* T.C. Memo. 1965–167, affirmed on another issue 364 F. 2d 744 (C.A. 2, 1966). In this case the petitioner was an Irish Sweepstakes winner and we held his payment of $6,000 to an accountant for tax and financial advice was deductible.