Robert C. HONODEL and Claire E. Honodel, et al., Petitioners-Appellants,

v.

COMMISSIONER OF THE INTERNAL REVENUE, Respondent-Appellee.

Nos. 82-7334, 82-7343 to 82-7345.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 9, 1983.

Decided Jan. 4, 1984.

As Modified Feb. 15, 1984.

---

J. Gordon Hansen, Hansen, Jones, Maycock & Leta, Salt Lake City, Utah, for petitioners-appellants.

Steven I. Frahnm, Tax Div., Washington, D.C., for respondent-appellee.

Before KENNEDY, TANG, and POOLE, Circuit Judges.

POOLE, Circuit Judge:

Taxpayers appeal from the ruling of the Tax Court which determined deficiencies in taxpayers' income taxes due for the taxable years 1972, 1973, and 1975. The taxpayers assert that the court erred in finding that certain fees paid to an investment advisory firm were nondeductible capital expenditures, and that the court wrongly rejected their method of calculating the depreciable life of their real property investments.

FACTS

During the years at issue, taxpayers were clients of Financial Management Service ("FMS"), an investment advisory service which provided financial management, investment, and tax analysis and advice to its clients. The stated goal of FMS was to minimize a client's income taxes while enhancing his estate. It primarily focused on real estate investments.

New clients typically were invited to attend financial investment planning sessions which helped to acquaint the client with the services provided by FMS, and at which FMS analyzed the client's existing financial position and recommended an investment and financial strategy for improving that position. Clients were then placed on an investment waiting list. If the client refused investments proposed by FMS, FMS dropped that person as a client. Each client's financial needs, position, and objectives were reviewed in periodic planning

sessions. The success of FMS was indicated by a long investment waiting list.

The projects recommended by FMS were arrived at by a long process, often over several years. Brokers around the country presented projects to FMS for its analysis. During the years involved here, FMS analyzed between 30 and 50 projects in order to decide which to recommend to its clients. When accepted by FMS, such projects were then recommended to clients according to their waiting list priority. While they could have declined to invest in a tendered project, none of the taxpayers chose to do so. Projects rejected by FMS were not discussed with clients. Once the projects were accepted projects, FMS engaged outside counsel to negotiate the acquisition of the properties and to prepare the necessary documentation. FMS also participated directly in the acquisition phase of accepted projects.

The client's investment in these recommended projects was normally in the form of a limited partnership interest, purchased through capital contributions. The limited partnerships were purchased primarily for tax shelter benefits and appreciation. The policy of FMS and its clients was that each investment project would be sold off when the desired tax benefits were no longer available.

FMS charged fees in two separate methods. First, clients were charged monthly nonrefundable retainer fees, the amount depending on that individual's income level and his financial planning, tax advice, and investment needs. Second, when a client elected to invest in a project, an investment or retainer fee representing a specific percentage of the total cost of the project was assessed. Each investor in a particular project paid according to his or her respective ownership interest. The retainer fee was fixed by FMS reflecting FMS' time and effort expended in selecting that specific project, and the costs of analyzing the numerous projects which FMS had rejected.

In the years at issue, FMS did not keep detailed records of the potential investments which were investigated but not chosen, their cost, or the time and effort attributable to individual clients.

During the relevant tax periods, the taxpayers invested in four apartment complexes in Sacramento, California, and pursuant to advice given by FMS, took depreciation allowances based on their limited partnership shares. FMS did not calculate the useful lives of the apartment buildings on the basis of the physical life of each structure, but instead calculated on the "economic useful life" of the particular investment to the clients. The economic useful life calculation was measured in large part by the estimated tax benefits.

The Tax Court ruled that the monthly retainer fees paid were deductible expenses, but that the one-time fees paid when FMS clients invested in a project were part of the acquisition cost and therefore nondeductible. *Honodel v. Commissioner*, 76 T.C. 351 (1981). The court also determined that the "economic useful life" approach to calculating annual depreciation levels adopted by FMS was without merit. The court then held the proper basis to be the physical useful life of an apartment complex and components thereof. The taxpayers appealed.

## I. WHETHER INVESTMENT FEES ARE DEDUCTIBLE CAPITAL EXPENDITURES.

The tax code provides to investors the same deductions for business expenses from taxable income as applies to income producing activities. Section 212 of the Internal Revenue Code of 1954 (26 U.S.C.) permits deductions for expenses charged to investment or tax advice. That section provides:

Sec. 212. Expenses for production of income

In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

(1) for the production or collection of income;

(2) for the management, conservation, or maintenance of property held for the production of income; or

(3) in connection with the determination, collection, or refund of any tax. Section 212 sets forth two requirements for deductibility: first, the expenses must be "ordinary and necessary," as that term has been interpreted by the courts and Treasury Department Regulations; and second, the expenses must fall within one of the three categories established by the statute.

Taxpayers concede that part of the investment fee claimed represents the direct costs of acquisition, which are not deductible. However, they argue that the Tax Court should have allocated the investment fee so as to distinguish between this non-deductible expense and other expenses which are deductible.

The Government does not dispute that such an allocation between capital acquisition costs and deductible expenses is proper in certain cases. *See Cohan v. Commissioner,* 39 F.2d 540 (2d Cir.1930).

The Tax Court declined to allocate any part of the investment fee to deductible expenses. First, the court ruled that the taxpayers had failed to provide sufficient credible evidence upon which to base a reasonable allocation; and second, that as a matter of law the expenses in question were not deductible in any case. Since we agree with the second conclusion, we need not further pursue the allocation issue. We hold that as a matter of law the deductions were properly disallowed in any event.

A. The "Ordinary and Necessary" Requirement

▮ The term "ordinary and necessary" has been used to distinguish expenditures that are nondeductible capital outlays from those that are deductible as current expenses. *Commissioner v. Lincoln Savings and Loan Assn.,* 403 U.S. 345, 353, 91 S.Ct. 1893, 1898, 29 L.Ed.2d 519 (1971). An expenditure is a nondeductible capital outlay if it is made to acquire a capital asset. *Id.*

at 354, 91 S.Ct. at 1899; *Commissioner v. Idaho Power Co.,* 418 U.S. 1, 94 S.Ct. 2757, 41 L.Ed.2d 535 (1974); *Spangler v. Commissioner,* 323 F.2d 913, 918–19 (9th Cir.1963); Treas.Regs. § 1.212–1(n).

The distinction is often close between ancillary costs related to capital assets which may properly be capitalized as part of the capital asset itself, and other related costs which should be considered costs of management and conservation of a capital asset. The Supreme Court, in the context of determining the category into which litigation expenses involving title to property should fall, held that the central inquiry should be whether the expense originated in "the process of acquisition itself." *Woodward v. Commissioner,* 397 U.S. 572, 577, 90 S.Ct. 1302, 1306, 25 L.Ed.2d 577 (1970). Further, in *Commissioner v. Lincoln Savings and Loan Assn.,* 403 U.S. at 354, 91 S.Ct. at 1899, in the context of "additional premiums" paid by a savings and loan association, the court stated:

What is important and controlling, we feel, is that the [insurance] payment serves to create or enhance for Lincoln what is essentially a separate and distinct additional asset and that, as an inevitable consequence, the payment is capital in nature and not an expense, let alone an ordinary expense, deductible under § 162(a) in the absence of other factors not established here.[1]

Accordingly, we must examine the investment fees paid by the taxpayers to FMS to determine whether the fees originated in the process of acquisition of property, *Woodward v. Commissioner,* 397 U.S. at 577, 90 S.Ct. at 1306, or if they served to create or enhance, from the taxpayers' view, additional capital assets. *Commissioner v. Lincoln Savings and Loan Assn.,* 403 U.S. at 354, 91 S.Ct. at 1899.

▮ As we have noted, FMS performed two general services for its clients,

---

1. Ordinary and necessary, as used in section 212, has the same meaning as in section 162(a), dealing with ordinary and necessary expenses of a trade or business. *United States v. Gilmore,* 372 U.S. 39, 49, 83 S.Ct. 623, 629, 9 L.Ed.2d 570 (1963); *Trust of Bingham v. Com-*

*missioner,* 325 U.S. 365, 373–374, 65 S.Ct. 1232, 1236–37, 89 L.Ed. 1670 (1945). Thus the holding of *Lincoln Savings* which construes § 162(a) is equally applicable to the present controversy.

an advisory function and an acquisition function. Fees paid for general investment advisory work are deductible under § 212. *Picker v. United States,* 371 F.2d 486, 499 (Ct.Cl.1967). Conversely, fees paid for those services rendered in the process of acquisition are capital in nature and are not deductible. *Kimmelman v. Commissioner,* 72 T.C. 294, 304–05, (1979). The complexity arises from the two-tier fee schedule employed by FMS in billing for its services. FMS charged all clients a monthly retainer fee for its investment advice, and charged an additional investment fee for each project in which a client chose to invest. As the Tax Court explained:

> Only those clients who decided to invest in a recommended project and took advantage of FMS's acquisition function paid the investment fees. Those clients who chose not to invest and hence were not required to pay the investment fee received the exact same investment services as those who chose to invest. Conversely, petitioners could only participate in an investment if they paid the investment fee. Each petitioner voluntarily could choose to invest in the projects. Each was cognizant of the fact that a decision to invest resulted in the imposition of this investment fee. This investment fee was a cost of acquiring an interest in the limited partnership projects herein.

76 T.C. at 367.

■ The Tax Court properly concluded that the monthly retainer fees were deductible under § 212(2) as fees paid for investment counsel. We conclude that the Tax Court was also correct in finding the investment fee associated with each project was a cost in connection with the acquisition of a capital asset and was not deductible under § 212. Legal, brokerage, accounting, and similar costs incurred in the acquisition of property have been held nondeductible capital expenditures. *Woodward v. Commissioner,* 397 U.S. at 576, 90 S.Ct. at 1305. "The law could hardly be otherwise, for such ancillary expenses incurred in acquiring or disposing of an asset are as much part of the cost of that asset as is the price

paid for it." *Id.* at 576, 90 S.Ct. at 1305, *citing Spangler v. Commissioner,* 323 F.2d 913, 921 (9th Cir.1963); *United States v. St. Joe Paper Co.,* 284 F.2d 430, 432 (5th Cir. 1960).

■ The analogy between the investment fee charged by FMS and brokerage fees is close. Brokerage fees are an ancillary cost of capital acquisition or sale and therefore are nondeductible. *Id.; Helvering v. Winmill,* 305 U.S. 79, 84, 59 S.Ct. 45, 47, 83 L.Ed. 52 (1938); *Spreckles v. Commissioner,* 315 U.S. 626, 62 S.Ct. 777, 86 L.Ed. 1073 (1942). Like a brokerage commission, the investment fee is a flat charge based on the percentage of the limited partnership interest purchased by the client. FMS conceded that the fee is not based on tax advice or investment counseling rendered to individual clients, but instead is designed as reimbursement for overhead costs, including the numerous investment projects investigated but not recommended by FMS. From the individual investor's point of view, the flat fee charged with each purchase of an interest in a project is an element of that capital purchase, as is a brokerage fee.

Accordingly, we affirm the Tax Court's disallowance of any deductions for investment fees paid in connection with particular investments, as they are costs of capital acquisitions and are not "ordinary and necessary" business expenses under the Tax Code. 26 U.S.C. § 212; *Commissioner v. Lincoln Savings and Loan Assn.,* 403 U.S. at 353, 91 S.Ct. at 1898.

We now consider each of the specific grounds urged by appellants for granting a partial deduction of the flat investment fees.

1. Section 212(2)

■ Taxpayers contend that the fees charged for services of investment counseling may be deducted under § 212(2) and the relevant regulations. Treas.Reg. § 1.212–1(g) specifically provides that fees charged for the services of investment counsel may be deductible, so long as (1) they are paid for "the management, conservation, or maintenance of the investments held by him," and (2) they are "ordinary and necessary." Because we have already deter-

mined that the flat investment fee paid is not ordinary and necessary, this section provides no basis for finding the investment fees deductible.

### 2. Section 212(3)

Taxpayers also assert that part of the investment fees are deductible under § 212(3), which provides that ordinary and necessary expenses paid "in connection with the determination, collection, or refund of any tax" may be deducted from taxable income. Taxpayers contend that as much as 50 percent of the flat investment fee paid represents costs of tax analysis and advice.

The Tax Court refused to allow any portion of the investment fee to be deducted under § 212(3), because the entire fee failed to meet the "ordinary and necessary" requirement of § 212 generally. *Honodel v. Commissioner,* 76 T.C. 351, 368 (1981). Taxpayers cite *Sharples v. United States,* 533 F.2d 550 (Ct.Cl.1976), as authority that such tax advice need not meet the "ordinary and necessary" requirement. Accordingly, they argue, even tax advice in connection with the acquisition or sale of a capital asset is a deductible expense.

In *Sharples,* taxpayer incurred legal expenses while contesting the application of a Venezuelan tax. The government challenged the applicability of § 212(3) because the foreign tax was imposed consequent to the liquidation of a corporate entity and the transfer of assets—a capital transaction. The Court of Claims held that the language of § 212(3), as well as the applicable regulations and legislative history, "provide *no different treatment* for expenses incurred in fighting a tax which arose from a capital transaction as opposed to expenses for contesting a tax which arose from a non-capi-

tal transaction." *Sharples,* 533 F.2d at 554. It was therefore immaterial whether the expense originated in the process of the acquisition or disposition of a capital asset, *Woodward v. Commissioner,* 397 U.S. at 577, 90 S.Ct. at 1306, because the court held that the "ordinary and necessary" requirement did not pertain to § 212(3).

*Sharples* is easily distinguishable. *Sharples* involved the deductibility under section 212(3) of *litigation expenses* in contesting tax liability. 533 F.2d at 554. Both the regulations cited[2] and the legislative history[3] indicate that litigation expenses involving tax liability will be deductible in most cases. But neither *Sharples,* nor the regulations nor the legislative history suggest that tax assistance directly related to an acquisition of a capital asset will always be deductible. In that sense, *Sharples* provides us with little guidance.

Further, we read the statute differently. The Court of Claims in *Sharples* focused solely on the language of subsection 212(3) and correctly concluded that, *within that subsection,* there was no limitation on the phrase "in connection with . . . any tax." *Sharples,* 533 F.2d at 553. However, this is not the end of the inquiry. The introductory language of section 212 contains a threshold requirement, that expenses be "ordinary and necessary," and this condition must be met in addition to the separate requirements posed in each of the subsections. Therefore, the deductibility of any expense related to tax advice or assistance must still turn on whether the origin of the tax-related expense was ordinary and necessary, or was a capital acquisition or disposition. *See Woodward v. Commissioner,* 397 U.S. at 577, 90 S.Ct. at 1306; *Commissioner v. Lincoln Savings and Loan Assn.,* 403 U.S. at 354, 91 S.Ct. at 1899. The regulations

**2.** The court in *Sharples* cites Treas.Reg. § 1.212–1(1), which provides: "Expenses paid . . . in conjunction with any proceeding involved in determining the extent of [taxpayer's] tax liability or in contesting his tax liability are deductible." *See* 533 F.2d at 554.

**3.** The *Sharples* opinion contained the following discussion of the legislative history of § 212(3): Congress, too, demonstrated its desire to have subsection 212(3) apply in a sweeping

manner. "Any expenses incurred in contesting any liability collected as a tax or as part of the tax will be deductible." S.Rep. No. 1622, *supra* at 218; H.Rep. No. 1337, *supra* at A 59 U.S.Code Cong. & Admin.News 1954, pp. 4196, 4855. Again, there is no indication of any intent that the "initial transaction" version of the "origin of the claim" rule overrides the clear meaning of subsection 212(3). 533 F.2d at 554.

issued by the Treasury Department are consistent with this analysis, contrary to the analysis of the court in *Sharples*. *See Sharples v. United States*, 533 F.2d at 554. While subsection 1.212–1(1) of the Treasury Regulations does broadly provide that expenses incurred for tax counsel or tax preparation are deductible, subsection 1.212–1(n) is equally clear that expenses which are properly treated as capital expenditures or related thereto are not deductible.

Similarly, we do not find *Collins v. Commissioner*, 54 T.C. 1656 (1970) persuasive precedent for the argument of taxpayers that the ordinary and necessary requirement of § 212 does not apply to tax advice connected to capital acquisitions. In *Collins*, the taxpayer deducted as ordinary and necessary expenses certain legal and accounting fees paid in connection with the acquisition of an apartment building. The Tax Court ruled that the ordinary and necessary requirement applied to the legal expenses charged for preparing the documents for the acquisition, and accordingly denied a deduction. Regarding the accounting fees, the Tax Court recognized that the "ordinary and necessary" requirement did apply to tax-related expenses under § 212(3), *Collins v. Commissioner*, 54 T.C. at 1666, yet allowed the entire deduction. The record indicates that some of the accounting expenses were for preparation of the taxpayer's income tax returns and representation before the Internal Revenue Service and the Tax Court. Such deductions are consistent with the interpretation of § 212(3) we take today. The Tax Court in *Collins* allowed deductions for other charges, under what we believe was an erroneously broad reading of § 212(3), and we decline to follow *Collins* in that respect.

 The statutory language is clear. Tax advice directly related to a capital acquisition or disposition is an expense which must be capitalized, just as are legal, brokerage, and other ancillary expenses. *Woodward v. Commissioner*, 397 U.S. at 576, 90 S.Ct. at 1305.

### 3. Section 165(c)(2)

Taxpayers urge that part of the investment fee should be allocated as a deductible loss under § 165(c)(2). During the years in question, FMS investigated, sometimes extensively, 30 to 50 projects which were rejected as investment opportunities and were never recommended to clients. Appellants suggest that 65 to 70 percent of the investment fees paid to FMS represented the costs of the numerous projects investigated in search of the few successful investment opportunities. These expenses, taxpayers urge, are losses for which they have not been compensated and are therefore deductible.

Section 165(c)(2) provides that as a general rule, a deduction is allowed for any loss sustained during the taxable year that is not compensated for by insurance or otherwise. An individual's deduction for loss is limited to "losses incurred in any transaction entered into for profit, though not connected with a trade or business." 26 U.S.C. § 165(c)(2).

 An essential requirement of this section is that the taxpayers seeking the deduction have entered into a *transaction*. Section 165(c)(2) deductions are normally not granted for expenses incurred in merely investigating possible transactions which are then not further pursued. *See O'Donnell v. Commissioner*, 62 T.C. 781, 785 (1974); *Dean v. Commissioner*, 56 T.C. 895, 902–03 (1971); *Seed v. Commissioner*, 52 T.C. 880, 885 (1969). As FMS has not demonstrated that any steps beyond an investigation were taken for any of the rejected projects, no deduction under this provision is warranted.[4]

### II. WHETHER THE TAX COURT ERRED IN REJECTING TAXPAYERS' METHOD OF CALCULATING DEPRECIATION ON THE PROPERTY.

 The Tax Court rejected as "totally without merit" the approach employed

---

4. Taxpayers' citation of *Larsen v. Commissioner*, 66 T.C. 478 (1976) is unavailing because in that case expenses were incurred in actively seeking a particular lease, rather than in mere investigation of the desirability of an acquisition.

by FMS and the taxpayers in calculating the useful lives of the apartment complexes for purposes of depreciation. The Tax Court's basis for rejecting the "economic useful lives" method is founded on that court's interpretation of law, and accordingly is subject to *de novo* review by this court. *Evans v. Commissioner,* 264 F.2d 502 (9th Cir.1959), *rev'd on other grounds, Massey Motors v. United States,* 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960). The Tax Court made fact findings concerning the physical useful lives of the buildings and components at issue, which are subject to the clearly erroneous standard of review. *Turner Construction Co. v. United States,* 364 F.2d 525, 527–28 (2d Cir.1966).

Briefly, the "economic useful life" approach urged by taxpayers would define the useful life of a capital asset as the period during which the asset would produce an acceptable rate of return, including tax benefits, to the investors. Their calculation first determines the physical useful life of a building and components under traditional concepts of deterioration and obsolescence. The physical useful life calculation would then be plugged into a mathematical mode to determine the economic useful life. Other variables in the mathematical mode involve the rate of return desired by the investors, tax benefits from depreciation, interest rates, the tax brackets of individual investors, and prevailing tax rates. *Honodel v. Commissioner,* 76 T.C. at 362 & n. 2. From this calculus the economic useful life *to the investor* is established, which is always shorter than the physical useful life.

Our analysis begins with the statute and the regulations governing permissible depreciation deductions. Section 167 of the Internal Revenue Code (26 U.S.C.) provides that a depreciation deduction shall be allowed for the "exhaustion, wear and tear ... of property held for the production of income." This depreciation deduction must be taken over the useful life of the asset, as defined in the regulations:

Section 1.167(a)–1(b), Income Tax Regs., states in pertinent part as follows:

(b) Useful life. For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. Salvage value is not a factor for the purpose of determining useful life. If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. * * *

There is no dispute as to the cost of the apartment buildings, the proper allocation of that cost among each building's components, or the method of depreciation used. The dispute is over the determination of the useful life in which each asset may be depreciated. The Tax Court held that "useful life" in this case means the physical useful life of a building and its components. Taxpayers contend that the useful life, as determined by their calculations, is the period over which the building may be profitably held as an investment, *i.e.,* so long as it produces a specified net return on the initial capital outlay. Taxpayers see support for this position in the language of the above-cited regulation, which states that the useful life of the asset is "the period over which the asset may reasonably be expected to be useful ... in [taxpayer's] trade or business." Therefore, they urge that the useful life of an apartment building is not its physical useful life, but its their useful life as a worthwhile invest-

ment, since making such investments is the taxpayers' relevant trade or business.

The leading case on the subject is *Massey Motors Inc. v. United States,* 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960). The taxpayers were in the car rental and leasing business, and claimed depreciation deductions on all cars based on a four-year useful life with no remaining salvage value. In fact, the cars were typically sold in a much shorter time period, for competitive reasons. However, by using the longer, physical useful life period for depreciation and by assuming no remaining salvage value, the taxpayer was able to avoid a substantial tax liability since revenues realized from the sale of the used cars were characterized wholly as capital gains and taxed at lower rates, while the depreciation was deducted from ordinary income.

The Supreme Court recognized that while some assets are used for their full physical life, "[s]ome assets ... are not acquired with intent to be employed in the business for their full economic life." *Massey Motors,* 364 U.S. at 96, 80 S.Ct. at 1414. For such assets, the language of the governing statute "may be fairly construed to mean that the *wear and tear* to the property must arise from its use in the *business* of the taxpayer—*i.e.,* useful life is measured by the use in a taxpayer's business, not by the full abstract economic life of the asset in any business." *Id.* at 97, 80 S.Ct. at 1415. Further, the statute should also be understood to mean that "the use and employment of the property in the *business* relates to the trade or business of the taxpayer— not, as is contended, to the type or class of assets subject to depreciation." *Id.* at 98, 80 S.Ct. at 1415.

This language, however, is of little aid to taxpayers here. The Court in *Massey* was primarily concerned with precluding taxpayers from employing a tax avoidance scheme in which automobiles only some 15 months old were treated as having no resale value for tax purposes. To this end, the Court stressed that taxpayers had to recognize that in their line of business, automobile leasing and rental, cars were not retained until they had no resale value but instead were sold in a relatively short peri-

od of time at a substantial price. In the present case, there is no agreement as to the proper characterization of the taxpayers' line of business. They disagree, for purposes of calculating the useful life of the apartment building and components, whether it should be described as the business of owning and operating apartment complexes, or the business of making profitable investments.

Surely, characterizing taxpayers' line of business merely as investments would work mischief in the enforcement of the tax laws of this country and would undermine the purpose of Congress in allowing for the depreciation deduction from taxable income. Regarding the first point, the Supreme Court has stressed that "it is the primary purpose of depreciation accounting to further the integrity of periodic income statements by making a meaningful allocation of the cost entailed in the use (excluding maintenance expense) of the asset to the period to which it contributes." *Id.* at 104, 80 S.Ct. at 1418. More broadly, the Court determined that the use of artificial calculations of depreciation contravened the intent of Congress in permitting depreciation deductions to be taken:

> Furthermore, as we have said, Congress intended by the depreciation allowance not to make taxpayers a profit thereby, but merely to protect them from a loss. The concept is, as taxpayers say, but an accounting one and, we add, should not be exchangeable in the market place. Accuracy in accounting requires that correct tabulations, not artificial ones, be used. Certainly it is neither accurate nor correct to carry in the depreciation equation a value of nothing as salvage on the resale of the automobiles, when the taxpayer actually received substantial sums therefor. On balance, therefore, it appears clear that the weight of both fairness and argument is with the Commissioner.

*Id.* at 101, 80 S.Ct. at 1416–17.

The taxpayers' method for determining useful life must be rejected. To do otherwise would enable individuals in any line of

business to adopt a definition of useful life not based on the experience in that industry or with similar property in that line of business, but rather on calculations as to which level of depreciation deductions would be the most profitable to their investment. *Cf. Coussement v. Commissioner*, 391 F.2d 227, 229 (6th Cir.1968) (court rejected taxpayer's contention that his rental property had a useful life of 20 years based on taxpayer's life expectancy). As the Tax Court noted, for example, the taxpayers' economic useful life formula would permit investors in the same property but with different personal income to deduct different amounts for depreciation purposes. 76 T.C. at 362. This is unacceptable. The same property must depreciate at the same rate for all investors using the same method. Depreciation relates to the property, not to its owner.

Accordingly, we affirm the Tax Court's rejection of the economic useful life formula proposed by taxpayers. Taxpayers were wrong in characterizing their line of business as that of investors and in seeking to include such factors as estimated tax benefits to the investors in the determination of useful life. "Rather, they should have focused on the nature of the partnerships' rental business and the use of the apartment complexes and their various components in that business." 76 T.C. at 362 n. 2. *See also Graves v. Commissioner*, 48 T.C. 7, 15 (1967), *aff'd*, 400 F.2d 528 (9th Cir.1968) (rejecting the inclusion of tax benefit considerations in determining useful life).

After hearing expert testimony presented by both parties, the Tax Court established the useful life of the apartment complexes and components for depreciation purposes. This is a finding of fact subject to review under the clearly erroneous standard. We find no clear error in the court's determination and affirm those findings.

## CONCLUSION

The Tax Court correctly declined to permit any portion of the flat investment fees to be deducted as current expenses, as the entire investment fee in each case was an expense ancillary to a capital transaction. The Tax Court also did not err in rejecting the economic useful life formula for calculating useful life of a capital asset, and established proper depreciation of the apartments and components in question using the statutory standards.

The judgment of the Tax Court is AFFIRMED.