NATHAN DOLIN AND MOLLY DOLIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dolin v. Commissioner
Docket No. 21174-85.
United States Tax Court
T.C. Memo 1988-2; 1988 Tax Ct. Memo LEXIS 2; 54 T.C.M. (CCH) 1448; T.C.M. (RIA) 88002; January 4, 1988. *2 Held: Respondent's determination that petitioner Nathan Dolin received income in his capacity as general partner sustained. Held further, petitioners are entitled to a deduction in 1981 in the amount of $ 108,000 for payment for investment advice. Richard R. Katcher, for the petitioners. Richard S. Bloom, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, *3 Judge: On April 18, 1985, respondent issued a statutory notice to petitioners for the taxable year 1981, having determined a deficiency in the amount of $ 83,134.92. After concessions, the issues for decision are: (1) Whether petitioner Nathan Dolin received income in 1981 from The Northern Union Club partnership in the amount of $ 48,232 in his capacity as general partner or as agent on behalf of Nate Dolin Associates; and (2) whether petitioner's payment of $ 108,000 was for "investment advice" and therefore deductible as an ordinary and necessary expense. FINDINGS OF FACT Petitioners Nathan and Molly Dolin, husband and wife, resided in the State of Ohio at the time the petition was filed. Petitioners filed joint Federal income tax returns for the years 1980 and 1981. At the time of trial, Mr. Dolin (sometimes referred to hereinafter as petitioner) was the chairman of the board of directors of Mortronics, Inc. He had formerrly been chairman of the board of directors of King Musical Instruments and Gulbransen Organ Company. The issues in this case arose due to petitioners' involvement in two different arrangements: a partnership in the business of investing and *4 trading in securities, and an agreement to share the profits of certain investments in securities. Prior to their involvement, petitioners had been investors in long-term securities for many years. Mr. Dolin usually made his own decisions about the investments he and Mrs. Dolin made, without the advice of investment counselors or brokers.
Income from Partnership
Sometime prior to 1979, petitioners decided to invest in The Northern Union Club (Northern), partnership which had been formed by their son Fred Dolin, and Barry Rubenstein, both of whom were registered representatives for Prescott, Bell and Turbin, a full-service brokerage firm. Fred Dolin and Mr. Rubenstein were the general partners of Northern; Mr. Rubenstein was also a limited partner. The purpose of the partnership was to conduct the business of investing and trading in securities. On January 1, 1979, Northern admitted petitioner, Mordo Corporation and Woodland Road Corporation as general partners. The Northern limited partnership agreement was amended to reflect the same. [1] The shareholders of Mordo Corporation were petitioners and Lawrence Dolin, their son. Petitioner owned 45 percent of Mordo, and Mrs. *5 Dolin and Lawrence Dolin owned 30 percent and 25 percent, respectively. Fred Dolin and Mr. Rubenstein were the shareholders of Woodland Road Corporation. The Mordo Corporation shareholders also held partnership interest in Nate Dolin Associates, which was formed December 30, 1980. The business of the partnership included investing through equity participations, loans, or otherwise, in investment securities, and engaging in investment management and financial consulting. Petitioner owned a 45-percent interest, and Mrs. Dolin and Lawrence Dolin owned 30 percent and 25 percent, respectively. The Northern partnership agreement was modified again on January 19, 1981. Mordo Corporation and Woodland Road Corporation were no longer listed as general partners and Mrs. Dolin was admitted as a limited partner. Restatement No. 3, which reflects this amendment, *6 provides that management of the partnership was to be conducted exclusively by the general partners. All general partners were to share the fee allocated for each fiscal period for management services. [2] The ratio by which they were to share the fee was to be determined from time-to-time by agreement among them, and in the absence of such agreement, petitioner was to receive one-half of the management fee and Fred Dolin and Mr. Rubenstein were to each receive one-fourth of the fee. The general partners were also to receive an expense fee as of the beginning of each fiscal period. *7 On February 18, 1981, petitioner, as general partner, received management and expense fees in the amount of $ 32,466 from Northern. That amount was reported on petitioners' 1981 income tax return as income from "consulting fees." On August 28, 1981, Northern issued additional checks to petitioner in the amounts of $ 14,874 and $ 33,358 in payment of the fees due a general partner for the first 6 months of 1981 under the Northern agreement. Petitioner endorsed the latter two checks, totaling $ 48,232, "Nate Dolin Associates," and deposited them in a bank account designated Nate Dolin Associates. The amount of $ 48,232 was subsequently included in the gross receipts reported by Nate Dolin Associates on its Form 1065 for the taxable year ended August 31, 1982. The Northern partnership agreement and restatements thereto make no reference to Nate Dolin Associates as general or limited partner. Further, petitioners apparently received Schedules K-1 from Northern, but Nate Dolin Associates was never shown as a partner. [3] Northern also did not make reference to Nate Dolin Associates on any SEC Schedule 13D filings. *8 In the statutory notice respondent determined that Mr. Dolin, rather than Nate Dolin Associates, received $ 48,232 as general partner in Northern and that petitioners should have included the entire amount in income reported in 1981.
Investment Advisory Fee
In April 1980, petitioner, Fred Dolin, Mr. Rubenstein, and Henry Carter met in Los Angeles to discuss business involving Northern. During the meeting, Mr. Rubenstein boasted about his investment abilities and the success he and Fred Dolin had in making investments in the stock market. Based on Mr. Rubenstein's remarks, petitioner offered to give him $ 500,000 to invest in the stock market and to pay him one-third of the profits realized on the investments. Mr. Rubenstein told petitioner that he would need only $ 200,000 and that he would be willing to assume one-third of the losses. Petitioner agreed to the arrangement based on a $ 200,000 investment but told Mr. Rubenstein that he would not have to assume one-third of the losses. In August 1980, petitioner opened a special account at Prescott, Ball and Turben with $ 185,000. Mr. Rubenstein used the funds in the account and amounts borrowed on margin to purchase *9 44,000 shares of Safeguard Industries, Inc., 18,000 shares of Academy Insurance Co., and 8,000 shares of Federal Screw Works. This Safeguard and Academy shares were sold later that year and petitioner realized short-term capital gains in the amount of $ 328, 847.93. The Federal Screw Works shares were sold at a loss in January 1981. Mr. Rubenstein received full brokerage commissions, which usually encompass fees for investment advice, on the purchase and sale of the shares. In addition he received a check dated January 21, 1981, from petitioner, in the amount of $ 108,000. [4] Mr. Rubenstein endorsed the check and deposited it in his personal checking account. He also included $ 108,000 in income in 1980. Profit-splitting arrangements between an account executive and a customer are generally prohibited by Prescott, Ball and Turben and other authorities. Such arrangements are against the investment firm's policies, and are in violation of the rules and regulations of the New York Stock Exchange and the NASD, *10 unless the executive has a financial interest in the account. When asked by the Compliance Director at Prescott, Ball and Turben about the $ 108,000 payment, Mr. Rubenstein reported that the money related to business dealings unrelated to securities transactions in Prescott accounts. The investment firm did not question the payment further. Petitioners claimed a deduction in the amount of $ 108,000 in 1981 for "investment advisory fees." In the notice of deficiency respondent determined that petitioners were not entitled to a deduction because they had not established that the amount paid to Mr. Rubenstein was an ordinary and necessary business expense or was expended for the purpose designated. OPINION
Issue 1
Petitioners contend that the checks totaling $ 48,232 were in payment of fees due to Nate Dolin Associates as general partner of Northern, not petitioner. Petitioners claim that in 1980 they were informed that Northern would not accept corporate partners. In order to preserve the Mordo shareholders' interest in Northern, Nate Dolin Associates was formed and substituted for Mordo Corporation as general partner. The partners in Nate Dolin Associates owned the *11 same percentage of the partnership as they owned of Mordo Corporation. Petitioners claim, however, that Nate Dolin Associates was not accepted as general partner because Northern permitted only individuals as partners, and petitioner therefore advised Northern that he would act as the agent of Nate Dolin Associates. In support of their position, petitioners produced the checks payable to Mr. Dolin which were endorsed Nate Dolin Associates and which were deposited in the Nate Dolin Associates bank account. Petitioners also claim that Mordo Corporation's withdrawal from Northern, the subsequent formation of Nate Dolin Associates, and the inclusion of $ 48,232 as income on the Nate Dolin Associates partnership return for the year ended August 31, 1982, support their position. [5]
Respondent argues that the Northern partnership agreement never listed Nate Dolin Associates as a general partner, and that the Nate *12 Dolin Associates partnership agreement makes no reference to Northern. Furthermore, petitioners apparently received Schedules K-1 from Northern that did not reflect Nate Dolin Associates as general partner, and Mr. Rubenstein testified that he was unaware that Nate Dolin Associates even existed. The only evidence, respondent contends, which suggests that petitioner was authorized to act as agent of Nate Dolin Associates, is his self-serving testimony, which is insufficient standing on its own. On the record before us petitioners have not satisfied their burden of proving that the payments were received by Mr. Dolin other than in his individual capacity as general partner of Northern. Rule 142(a). Petitioners have not established that an agency relationship existed or that the arrangements were anything other than which the Northern partnership documents reflect. See Coleman v. Commissioner,87 T.C. 178, 202 (1986), affd. per curiam 833 F.2d 303 (3d Cir. 1987), and cases cited therein. Although the documents indicate that Mordo Corporation ceased to be a general partner as of January 1, 1981, nowhere do they indicate that petitioner's interest *13 in Northern changed. We presume, if petitioner had been a general partner both individually and as agent of Nate Dolin Associates, some change in ownership interest or in capital accounts would be reflected. However, the record is devoid of any such information. The Northern partnership agreement and amendments do not specify percentage of ownership and the partnership's returns were not put into evidence. [6] Furthermore, although Restatement No. 3 reflects that the management fee was to be allocated among petitioner, Fred Dolin, and Mr. Rubenstein instead of between Mordo Corporation and Woodland Road Corporation as in prior years, this indicates only that the general partners, to whom those fees were paid, changed upon the withdrawal of Mordo Corporation and Woodland Road Corporation, not that Nate Dolin Associates was substituted for Mordo Corporation and that an agency relationship was created. Petitioners cite a *14 number of cases for the proposition, with which we agree, that amounts received by a taxpayer who is acting as a conduit are not income that he is required to report. However, on the facts before us, petitioners have not established that Mr. Dolin was acting as a conduit. If in fact he was, he apparently permitted Northern to file false partnership returns and false SEC registration certificates. Furthermore, petitioners offered no evidence, other than Mr. Dolin's testimony, that he was authorized to act as agent on behalf of Nate Dolin Associates. In light of the partnership documents which make no reference to the agency relationship, and the lack of information reflecting a change in petitioner's interest in Northern, his testimony is insufficient to overcome the presumption of correctness attached to respondent's statutory notice. [7] On these facts respondent's determination is sustained. Issue 2
In the statutory notice, respondent determined that petitioners' deduction in the amount of $ 108,000 was not *15 allowable in 1981 because petitioners did not establish that the $ 108,000 paid to Mr. Rubenstein was an ordinary and necessary expense or was expended for the purpose designated. On brief respondent argues that the arrangement between petitioner and Mr. Rubenstein was a joint venture and that the $ 108,000 payment represented a nondeductible distribution of the venture proceeds to Mr. Rubenstein. In maintaining this position, respondent concedes that petitioners incorrectly reported the entire profit from securities in 1980, a year not before the Court. Petitioners urge us to disregard respondent's joint venture argument because respondent raised it for the first time on brief. [8] Petitioners argue that considering the argument at this late date will prejudice their case. If the argument had been raised earlier, they contend, the issue would not have been litigated because the question would have been whether petitioners should have reduced their income in 1980 or 1981, not whether petitioners could reduce their income at all. Furthermore, had petitioners known of respondent's position prior to trial, they would have introduced testimony regarding respondent's audit of the year *16 1980, and pertaining to the statute of limitations which now bars them from amending their 1980 return. [9]
*17 This Court has refused to consider new theories raised for the first time on brief where our consideration of such theories would prejudice petitioner. E.g., Leahy v. Commissioner,87 T.C. 56, 64-65 (1986); Aero Rental v. Commissioner,64 T.C. 331, 338 (1975); Theatre Concessions, Inc. v. Commissioner,29 T.C. 754, 760 (1958). "Of key importance in evaluating the existence of prejudice is the amount of surprise and the need for additional evidence on behalf of the party in opposition to the new position." Leahy v. Commissioner, supra at 64. In this case we find that petitioners are prejudiced by the untimeliness of respondent's argument. Without any prior indication whatsoever, respondent now raises an argument which in effect permits petitioners to reduce their income, but in a year other than the year before the Court, and which bears no relation to whether the amount should be allowed as a deduction for an ordinary and necessary expense. Petitioners were given no opportunity to put on any evidence in opposition *18 to respondent's new argument. Respondent had several other opportunities to raise the joint venture argument. Seligman v. Commissioner,84 T.C. 191, 198 (1985), affd. 796 F.2d 116 (5th Cir. 1986). Because he has delayed in disclosing his theory to the obvious detriment of petitioners, we will not consider it in the disposition of this case. Petitioners contend that the $ 108,000 payment to Mr. Rubenstein is deductible as an ordinary expense pursuant to section 212. Petitioners rely on Honodel v. Commissioner,76 T.C. 351 (1981), affd. 722 F.2d 1462 (9th Cir. 1984), in which we concluded that fees paid for investment advice are deductible under section 212. Respondent argues that the services provided included the execution of purchases and sales of stock, and therefore are distinguishable from payments for investment advice. He contends that the services provided by Mr. Rubenstein are more like services provided by brokerage houses, feeds for which are capital expenditures. Helvering v. Winmill,305 U.S. 79 (1938); sec. 1.263(a)-2(e), Income Tax Regs. Respondent *19 argues further that the payment was not reasonable in amount, "ordinary," or "necessary." In Honodel we distinguished between fees paid for investment advice, which are deductible as an ordinary and necessary expense, and fees paid for services rendered in the "process of acquisition" of capital assets, which are treated as a capital expenditure. Honodel v. Commissioner, supra at 365. We looked to "'the nature of the services performed' by the investment adviser rather than 'their designation or treatment' by the taxpayer." Honodel v. Commissioner, supra, citing Cagle v. Commissioner,63 T.C. 86, 96 (1974), affd. 539 F.2d 409 (5th Cir. 1976). We concluded that services provided that related to periodic planning sessions and the evaluation of potential investments, to the extent needed to formulate an opinion regarding such investments, were investment advice. Services rendered in the process of acquisition, including negotiating the purchase and creating the investment vehicle (in that case certain partnerships), were *20 capital in nature. Honodel v. Commissioner, supra at 366. In this case we find that the amount to Mr. Rubenstein was for investment advice and, under the circumstances, was an ordinary and necessary expense. The undisputed testimony of petitioner and Mr. Rubenstein establishes that petitioner made the offer to pay Mr. Rubenstein one-third of the profits in return for Mr. Rubenstein's investment expertise. The fee was paid in addition to Mr. Rubenstein's normal brokerage fees, which we assume included commissions for the purchase and sale of securities. Furthermore, the fee related to the profit from an investment in securities made by Mr. Rubenstein for petitioner, pursuant to their oral agreemeent. It was in this sense unrelated to and independent of the costs of acquiring or selling a security. In other words, the payment was dependent on Mr. Rubenstein's expertise and his choice of securities rather than his procurement of those securities. Even though the payment may have been contrary to the brokerage house policies and the rules and regulations of the stock exchange, it was payment of an obligation. Although the agreement was unusual, [10] once it *21 was entered into, the payment in discharged was ordinary and necessary. Cf. Wakelee v. Commissioner,17 T.C. 745 (1951). Based on the foregoing, petitioners are entitled to a deduction in the amount of $ 108,000 in 1981. Decision will be entered under Rule 155.
Footnotes
1. The amended agreement also reflects that petitioner and Mordo Corporation were limited partners of Northern prior to their admittance as general partners. They are not, however, listed as such on the original partnership agreement and no documents in the record reflect at what point they were admitted as limited partners. ↩
2. Restatement Nos. 1 and 2, dated January 1, 1979, and January 1, 1980, respectively, provided that Woodland Road Corporation and Mordo Corporation were to share the fee allocated for management services. The Restatements reflect that other amendments were made to the original Northern partnership agreement, however those amendments were not made a part of the record. Furthermore, the original Northern partnership agreement and the Restatements do not reflect the capital contributions of the limited or general partners; there is no indication as to the percentage held by each partner or when and whether changes in percentage of ownership occurred. ↩
3. The Northern partnership returns were not a part of the record, nor were the Schedules K-1, however, in response to the Court's inquiry, petitioner's counsel submitted that there were no reference to Nate Dolin Associates. ↩
4. Petitioner estimated the loss on the Federal Screw Works shares and took the estimated amount into account when he calculated the $ 108,000 due Mr. Rubenstein. ↩
5. With respect to the Nate Dolin Associates partnership return, we note that the partnership reported $ 101,782.16 in gross receipts for the fiscal year September 1, 1981, to August 31, 1982. The parties stipulated that the $ 48,232 was included in the gross receipts. ↩
6. Petitioners' 1980 and 1981 returns summarize their profits and losses from various partnership interests. However, the information forms received from the partnerships, including Northern, were not attached to the returns and were not put into evidence. ↩
7. In this regard we note that petitioners did not have Mrs. Dolin, Fred Dolin, or Lawrence Dolin testify regarding Mordo Corporation or Nate Dolin Associates.↩
8. Respondent's trial memorandum makes reference only to whether petitioners are allowed, under section 162 or 212, a deduction for the $ 108,000 paid to Barry Rubenstein. At trial the Court asked petitioners' counsel if the arrangement could be analyzed as a joint venture and later referred to a "joint venture" again when asking Mr. Baker, Prescott, Ball and Turben's Compliance Director, about how profit-sharing arrangements were viewed by the firm. In the same vein, the Court questioned Mr. Rubenstein about whether he treated the special account as a "species of investment partnership." Although a joint venture analysis seems appropriate on the facts before us, the Court's line of questioning was not pursued by either party and we do not consider such inquiries to have put petitioners on notice that respondent planned to argue that the arrangement was a joint venture. ↩
9. Petitioners claim that at the time the petition in this case was filed, the year 1980 was open because of Form 872A, extending the statute of limitations for that year, was in effect. Had respondent raised the joint-venture issue in the statutory notice, petitioners could have amended their 1980 return. Petitioners further allege that the same agent audited their 1980 and 1981 returns and that petitioners were advised by the Service on November 15, 1985, that the examination of the 1980 return was complete and that no change was required in petitioners' reported tax. ↩
10. We note that the arrangement was similar to a contingent fee arrangement which generally are permissible. See sec. 1.162-7(b)(2), Income Tax Regs.↩