T.C. Memo. 1997-116


UNITED STATES TAX COURT


POPE & TALBOT, INC., & SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 530-93.                    Filed March 6, 1997.


<u>Grady M. Bolding</u>, <u>James E. Burns, Jr.</u>, <u>Russell D. Uzes</u>,
<u>Kevin P. Muck</u>, and <u>D. Cameron Baker</u>, for petitioner.

<u>Milton J. Carter, Jr.</u>, <u>Terri Merriam</u>, <u>Henry T. Schaefer</u>,
<u>Christopher D. Hatfield</u>, <u>Randall E. Heath</u>, and <u>Robert F.
Geraghty</u>, for respondent.


MEMORANDUM OPINION


RUWE, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's 1985 and 1986 Federal income taxes in the amounts of
$17,693,960 and $954,678, respectively.  In <u>Pope & Talbot, Inc. &</u>

Subs. v. Commissioner, 104 T.C. 574 (1995), we denied petitioner's motion for partial summary judgment and granted respondent's motion for partial summary judgment, holding that under section 311(d),[1] petitioner's gain on the distribution of appreciated property is to be determined as if petitioner sold the property in its entirety for fair market value and not by reference to the value of the property interest received by each shareholder.

The primary issue for decision herein is the fair market value of the property distributed by petitioner. After concessions, the remaining issues for decision are: (1) Whether petitioner may offset fees in the amount of $1,364,071 in 1985, which were incurred in connection with the distribution, against its section 311(d) gain as costs of sale; (2) whether petitioner may deduct investment banking fees in the amounts of $89,788.08 and $66,195.92 in 1985 and 1986, respectively, for advice regarding potential hostile takeovers; and (3) whether petitioner may deduct $1,465 paid to Depository Trust Co. in 1985 in connection with holding petitioner's stock.

Some of the facts have been stipulated and are so found. The stipulation of facts, first supplemental stipulation of facts, and stipulations of exhibits are incorporated herein by

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

this reference.  For purposes of convenience, our findings of fact with respect to respondent's specific determinations will be combined with our opinion on each issue.

## Background

Petitioner is a publicly held Delaware corporation with its principal place of business in Portland, Oregon.  Petitioner's shares are traded on the New York Stock Exchange.  During 1985, petitioner engaged in several businesses, primarily in Oregon and Washington, including timber, sawmill and pulp mill operations, land development, and resort businesses.

In October 1985, petitioner's board of directors adopted a Plan of Distribution (the plan).  Under the terms of the plan, petitioner would transfer its timber and land development properties and related assets located in the State of Washington (collectively referred to as the "Washington properties") to Pope Resources, a newly formed Delaware limited partnership (the Partnership).  Upon transfer of the Washington properties to the Partnership, the managing general partner was to make a pro rata distribution of the interests in the Partnership (partnership units or units), on the basis of one partnership unit for each five shares of common stock.

Petitioner's board of directors believed the plan to be in the best interests of petitioner's shareholders for several reasons.  First, the plan would provide certain tax benefits,

including elimination of the double tax associated with the corporate form and the passing through of net losses to the unitholders. Next, the plan would substantially improve petitioner's balance sheet by increasing the shareholder's equity by approximately $2.4 million and generating approximately $25.9 million in cash. Finally, the plan would provide potential increased economic returns from the Washington properties to the unitholders. The board of directors believed that the market value of the Washington properties was not fully reflected in the trading price of petitioner's common stock, and, by placing these properties in a separate entity, the board of directors could achieve a higher overall value for the shareholders.

Petitioner's shareholders approved the plan at a special shareholder's meeting on December 4, 1985. On December 6, 1985, prior to the effective date of the plan, the partnership units began trading on a "when issued"[2] basis on the Pacific Stock Exchange. There were approximately 1.2 million partnership units, and the weighted average trading price of the units for the period December 6, 1985, through January 7, 1986, was approximately $11.50 per unit.

On December 20, 1985, pursuant to the terms of the plan, petitioner (1) borrowed approximately $22.5 million from

---

[2]"When issued" is a term used in connection with a security not yet authorized for issuance. It refers to a conditional transaction in which one indicates a desire to buy when the security is authorized and available for sale.

Travelers Insurance Co., secured by approximately 71,363 acres of its timberlands located in the State of Washington; (2) transferred all its approximately 78,000 acres[3] of Washington timberlands to the Partnership, subject to the Travelers' loan; (3) transferred all its Washington land development and resort business to the Partnership;[4] (4) transferred $1.5 million in cash to the Partnership for working capital; and (5) sold certain installment note receivables to the Partnership for approximately $4.9 million in cash.

The original general partners of the Partnership were Pope MGP, Inc. (MGP), and Pope EGP, Inc. (EGP), both Delaware corporations. Initially, MGP and EGP were owned equally by two of petitioner's principal shareholders, Peter T. Pope and Emily T. Andrews. The corporate general partners held an aggregate interest of approximately 1 percent in the capital, profits, losses, and distributions of the Partnership. Responsibility and authority for management of the Partnership was vested exclusively in MGP as the managing general partner. Limited partners had no management power and only limited voting rights. MGP could be removed and replaced as managing general partner only with the affirmative vote of partners of record holding at least (1) 66-2/3 percent of the units issued upon distribution

---

[3]Petitioner's proxy statement refers to 78,300 acres.

[4]This included 4,400 acres in addition to the 78,000 acres of timberlands.

that have been held by the unitholder or the unitholder's family continuously for at least 5 years, or (2) 90 percent of units held by all partners. Petitioner was not a partner in the Partnership and received no partnership units.

On December 20, 1985, descendants of the founding families owned 34.36 percent of the outstanding stock of petitioner--the Pope family owned 21.04 percent, and the Andrews family owned 13.32 percent. They received corresponding percentages of partnership units. Peter T. Pope and Adolphus Andrews, Jr., were members of the board of directors of petitioner, and Mr. Pope was the chairman of the board and the chief executive officer.

## Discussion

The first issue we must decide is the fair market value of the Washington properties transferred by petitioner to the Partnership. Fair market value is traditionally defined as the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); Buse v. Commissioner, 71 T.C. 1129, 1135 (1979). The standard is objective, using a purely hypothetical willing buyer and seller. Propstra v. United States, 680 F.2d 1248, 1251-1252 (9th Cir. 1982); Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990). However, the hypothetical sale should not be constructed

in a vacuum isolated from the actual facts that affect value. Estate of Andrews v. Commissioner, 79 T.C. 938, 956 (1982).

The determination of fair market value is a question of fact. Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Estate of Newhouse v. Commissioner, supra at 217. In general, property is valued as of the valuation date on the basis of market conditions and facts available on that date--without regard to hindsight. Subsequent events are considered only to the extent that they were reasonably foreseeable at the date of valuation. Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987). Moreover, valuation is generally based on the highest and best use of the property to be valued. Buse v. Commissioner, supra at 1137.

Both parties have submitted very extensive expert witness reports and testimony relating to the fair market value of the Washington properties. While expert opinions can assist the Court in evaluating a claim, we are not bound by the opinion of any expert witness and may reach a decision based on our own analysis of all the evidence in the record. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Estate of Newhouse v. Commissioner, supra at 217.

Value of Timber, Timberlands, and Development Property

The timberlands transferred to the Partnership consisted of approximately 78,000 acres of timberland located in the Puget Sound area of the State of Washington, within a 50-mile radius of Seattle, Washington. According to petitioner's proxy statement, which describes this transaction, the timberlands included approximately 650 million board feet[5] of commercial softwood stands, 75 percent of which were Douglas fir and the remainder of which were hemlock and other species. The proxy statement shows the approximate age class distribution of petitioner's softwood stands in 1985 as follows:

|             | Board Feet   |            |
| Age Class   | (in millions) | Percentage |
|-------------|--------------|------------|
| 0-39 years  | 41           | 6.2        |
| 40-49 years | 327          | 49.8       |
| 50-59 years | 127          | 19.3       |
| 60-69 years | 75           | 11.4       |
| 70+ years   | 87           | 13.3       |
|             | 657          | 100.0      |

In general, petitioner harvested softwood stands after they attained 50 years of age. According to the proxy statement, the timberlands also included approximately 205 million board feet of hardwood stands, consisting mostly of alder that had little

---

[5]A board foot is a unit of measure for sawtimber and lumber that is 12-inches square and 1-inch thick.

commercial value.  The market for timber and timberland was depressed in 1985 but began to rise in mid-1986.

Petitioner's expert, Ray E. Granvall, Jr., of Cascade Appraisal Services, Inc., appraised approximately 79,127 acres of timberland[6] containing about 796,729 thousand board feet (MBF) of merchantable timber as of December 20, 1985, and concluded that the market value of the property was $26,510,000.  Mr. Granvall relied primarily on an economic approach, in which he separately valued merchantable timber, reproduction timber (i.e., premerchantable timber that is less than 40 years of age), and bare land and adjusted these indicated values to fair market value by applying a comparable sales adjustment factor.

Mr. Granvall considered merchantable timber to include softwood and hardwood stands over 40 years old.  In estimating the value of merchantable timber, Mr. Granvall utilized a procedure known as "Conversion Return Analysis".  This approach starts with the value of the end-product, generally the spot market prices for logs, and then deducts logging costs to arrive at an indicated value for the merchantable timber.  Mr. Granvall started with an average delivered log price of $187/MBF.  He arrived at this figure using published price lists for both

---

[6]This figure includes acreage that petitioner described as development properties in its proxy statement.

domestic and export markets. He then subtracted the following

logging costs:

| Cost Component | Dollars Per MBF |
|---|---|
| Fall and buck | $17 |
| Yard and load | 58 |
| Haul | 45 |
| Road construction | 7 |
| Road use/maintenance | 2 |
| Slash | 1 |
| Scaling | 3 |
| Administrative | 5 |
| Excise tax | 9 |
| Reforestation | 7 |
| Total | $154 |

Mr. Granvall also subtracted a profit and risk factor equal to

$4/MBF.[7]  Finally, Mr. Granvall applied a comparable sales

adjustment factor of .61, which is equivalent to a 39-percent

discount, to the net log value to arrive at an indicated value

for merchantable timber of $18/MBF, or $14,341,122 total.

Mr. Granvall computed his comparable sales adjustment factor

by averaging the transaction prices for four comparable sales

that he selected and adjusted for size differences. The four

comparable sales selected by Mr. Granvall occurred between July

1983 and March 1985 and ranged in size between 2,904 and 134,000

acres.

---

[7]He estimated the profit and risk at 12.5 percent of the
delivered log value (net of logging costs) and adjusted that
amount for contract profit, which was already included within the
delivered log values.

Mr. Granvall estimated the value of reproduction timber using a discounted cash-flow analysis.  In applying this analysis, Mr. Granvall considered any timber less than 40 years of age to be reproduction timber.  Mr. Granvall projected the value of the reproduction timber at 50 years, which he considered to be the optimum harvest age, and discounted it to present value using discount rates ranging from 4.7 percent for Site V (highly productive) to 7.7 percent for Site I (poorly productive).  He then applied the comparable sales adjustment factor of .61 to arrive at a total value for reproduction timber of $4,937,389.

Mr. Granvall estimated the value of bare land by site class and then applied the comparable sales adjustment factor to the total.  Using this approach, Mr. Granvall estimated the value of the bare land at $7,233,807.

Respondent's expert, James W. Prochnau of Jackson & Prochnau, Inc., appraised approximately 69,000 acres[8] of

---

[8]The difference in the number of acres appraised by each expert as timberland is attributable to their differing opinions as to how much of the land has a higher and better use as something other than timberland.  It is petitioner's contention that, in addition to the 79,127 acres of undeveloped land classified as timberland by Mr. Granvall, approximately 2,000 acres of land transferred to the Partnership had a higher and better use as development land.  Respondent, on the other hand, argues that of the undeveloped land transferred to the Partnership, only 69,000 acres should be classified as timberland while 11,084 acres had a reasonable potential for development and, accordingly, should be valued as such.  The parties refer to this "higher and better use" property as transitional or development property.

timberland containing about 422,523 MBF of merchantable timber as of December 20, 1985, and concluded that the market value of the property was $63.5 million. Mr. Prochnau first divided the timberland into six smaller parcels based on geographic location and market access. His rationale for doing so was: (1) To attract buyers who are interested in specific income property or may be incapable of financing the purchase of larger properties, (2) to liquidate the property quickly, and (3) to maximize sales revenue (smaller units reduce the discount related to the wholesale nature of larger sales). Mr. Prochnau then applied a valuation methodology similar to that of Mr. Granvall. He estimated the value of each component (i.e., merchantable timber, reproduction timber, and bare land) and multiplied the total by a ratio to arrive at the total market value.

In estimating the value of merchantable timber, which he defined as softwood stands 50 years and older and hardwood stands 40 years or older, Mr. Prochnau used published price quotes and contract sales prices to arrive at an average[9] delivered log price of $199.82/MBF. He then subtracted the following average logging costs:

---

[9]The average amounts of delivered log prices and logging costs are spread over only five of the six parcels of timberland, because tract number six contained no merchantable timber.

| Cost Component | Dollars Per MBF |
|---|---|
| Fall and buck | $13.56 |
| Yard and load | 44.21 |
| Trucking | 30.72 |
| Road construction | 6.00 |
| Road maintenance/fees | 1.00 |
| Excise tax | 6.00 |
| Contingency | 5.00 |
| Total | $106.49 |

Mr. Prochnau thus determined that the gross value of the merchantable timber (before applying any discount) was $37,646,264.

Mr. Prochnau then estimated the value of reproduction timber using a growth-discount analysis that grows reproduction timber (i.e., timber younger than 50 years) to age 50 and then discounts the harvest value to present value. The delivered log price is determined in the same manner as for merchantable timber. To this price, Mr. Prochnau applied an appreciation rate of 1.5 percent and deducted carrying charges of $6 per acre. This future value was then discounted to present value using a rate of 7 percent. Using this approach, Mr. Prochnau estimated the value of reproduction timber at $36,252,683, before making a comparable sales adjustment.

Mr. Prochnau estimated the value of bare land by site class using a comparable sales analysis. Mr. Prochnau utilized 21 comparable sales between December 1983 and March 1988, ranging in size between 20 and 16,394 acres. He adjusted these comparable

sales for differences in location (i.e., proximity to shipping or delivery points and desirability of location) and concluded that the total gross value (before discount) of the bare land was $7,770,699.

Mr. Prochnau took the sum of the gross values for each of the components (i.e., merchantable timber, reproduction timber, and bare land) and determined an indicated value under two different approaches--the comparable sales approach and the income approach. Under the comparable sales approach, Mr. Prochnau utilized 33 comparable sales of between 20 and 53,916 acres that occurred between December 1983 and September 1991. For each comparable sale, Mr. Prochnau calculated a comparable sales ratio equal to the actual sale price divided by the gross value of the components as estimated by Mr. Prochnau. The comparable sales ratio is relative to the term "discount" or "premium" commonly referred to in appraisals. He then performed a regression analysis to plot the variation of comparable sales ratios over the range of comparable sale sizes. The comparable sales ratio chosen by Mr. Prochnau for each tract of the subject property was between .7549 and .9957, indicating a discount of between .43 and 24.51 percent. Applying the appropriate comparable sales ratio to the total gross value of each tract of the subject property, Mr. Prochnau calculated an indicated value of $63,980,100 for the subject property under the comparable sales approach.

Under the income approach, the gross values of reproduction timber and bare land were determined as they were for the comparable sales approach. The merchantable timber component, however, was adjusted for time (by applying an interest rate of 8.5 percent) and profit and risk (10 percent of net stumpage value). An income ratio was then calculated for each tract by dividing the component value of merchantable timber as adjusted for time and profit and risk by the gross component value of merchantable timber. The income ratios for each tract as determined by Mr. Prochnau ranged from .7124 to .8618, indicating a discount between 13.82 and 28.76 percent. The income ratios were then applied to the reproduction timber and bare land components, and the product was added to the adjusted merchantable timber value, yielding a total indicated value of $63,092,357 under the income approach.

Mr. Prochnau based his final conclusion of $63.5 million on the indicated values under both the comparable sales and income approaches.

Overall, the parties' experts used similar approaches in valuing the timber and timberland. Where the experts differ primarily is in their calculation of logging costs, the discount applied to the gross value of the subject property, the treatment of reproduction timber, and the amount of property that has a higher and better use, and thus a higher value, than timberland.

In determining the logging costs, both experts included contract logging and associated costs (i.e., the costs that would be incurred by a landowner in harvesting the timber and delivering it to the point of sale). Specifically, these costs include: (1) Falling, or cutting the trees; (2) bucking, or sectioning the trees into log lengths that maximize volume and value; (3) yarding, or moving the bucked logs from the woods to a roadside landing; (4) loading the logs onto trucks; (5) hauling, or transporting the logs to the mill; (6) road construction and maintenance; (7) excise taxes; and (8) contract administration, or keeping track of the contractors hired to harvest the timber.

Petitioner's expert, however, included scaling, reforestation, and slash disposal costs in addition to the contract logging costs. Scaling is the measuring and grading of logs once they have arrived at the log dump or mill. It is generally performed by an independent third party, and the cost is typically paid by the purchaser of the timber. Slash burning and reforestation involve cleaning the ground and replanting the timber that has been removed from the timberland. Reforestation is required by Washington law in order to maintain the property's designation as forestland. If the owner fails to reforest the property, it will be converted to ad valorem land, which is taxed at a higher rate. In addition, upon conversion, the owner must pay a conversion tax equal to the additional amount of tax that

the owner would have paid if the property had been subject to the ad valorem tax rate for the preceding 10 years.

In the present case, we are trying to determine what a hypothetical buyer would pay for an entire tree farm, not just the delivered logs. Thus, we think that a buyer would consider such costs as slash burning and reforestation, because those are costs associated with operating a tree farm. Petitioner has not persuaded us, however, that a hypothetical buyer would consider scaling costs, as those costs are normally incurred by the purchaser of the timber, not the owner of the tree farm.

Respondent also argues that petitioner's expert has overstated the contract logging costs. The parties agree that petitioner's actual costs for 1985 are relevant in determining the reasonableness of any cost estimate. Petitioner claims that its actual costs were approximately $161/MBF in 1985, which establishes the reasonableness of Mr. Granvall's estimate of $154/MBF. However, petitioner's actual cost records include a substantial amount for general administrative costs that significantly exceeds the amount of administrative costs that even petitioner's expert includes in costs. Respondent, on the other hand, claims that petitioner's actual costs, using only the cost items listed by petitioner's expert, were approximately $107/MBF, which confirms the reasonableness of Mr. Prochnau's estimate of $106.48/MBF. However, this is partially attributable to differences in the way the cost elements are described in the

expert report and petitioner's cost records.  Based upon our analysis of petitioner's cost records and giving due consideration to all the evidence with respect to logging costs, we find $130 to $140/MBF to be a reasonable cost estimate range.

The next fact upon which the parties' experts disagree is the discount to be applied to the gross value of the subject property.  Both of the parties' experts discounted their initial valuation estimate for the size of the parcel and agreed that the larger the parcel, the larger the discount.  Both of the experts derived their discounts from comparable sales.  However, respondent's expert, Mr. Prochnau, applied an average discount of 21.66 percent, while petitioner's expert, Mr. Granvall, applied a discount of 39 percent.  The difference results largely from their differing assumptions about how the timberland should be marketed.  Mr. Prochnau divided the property into six parcels, while Mr. Granvall assumed that the property would be sold as a single parcel.  Mr. Prochnau believed that partitioning the property would maximize the sales revenue (because of the smaller discount), result in a shorter liquidation period for the property, and attract smaller buyers who would not be able to finance the purchase of a larger parcel.  Mr. Granvall, on the other hand, believed that operating large tracts of timberland was more efficient and that the practice in the timber industry in 1985 was to sell land in large blocks.

While we agree that partitioning the land into smaller parcels would reduce the overall discount, we do not think that partitioning the land is appropriate in the present case. Given the depressed market and lack of demand for timberland in 1985, we do not see how partitioning the land into smaller parcels would significantly shorten the liquidation period for the property. Moreover, the owner would incur additional costs in partitioning and selling multiple parcels of land. The evidence indicates that while smaller buyers were entering the timberland market in 1986 and later, the most likely buyers in 1985 were large, industrial buyers. Accordingly, we shall consider the value of the timberland as if it were sold as a single parcel. Viewing the sale as such, we believe that a 39-percent discount would be appropriate.

The parties' experts also disagree upon the classification of reproduction timber. The optimal harvest age for softwood timber was 50 years. Both parties' experts assumed for purposes of applying their discounted cash-flow analyses that reproduction timber would be held to age 50. The difference lies in the experts' treatment of timber between the ages of 40 and 49 years. Mr. Prochnau, respondent's expert, treated the timber falling in the 40-49 age group as reproduction timber.[10] Mr. Granvall,

---

[10]Actually, Mr. Prochnau classified softwood timber under 50 years into two categories--timber between 30 and 49 years was classified as "immature", and timber less than 30 years was

(continued...)

petitioner's expert, treated such timber as merchantable.  We note that almost 50 percent of petitioner's timber fell within the 40-49 age classification.

We find Mr. Granvall's approach to be inconsistent.  For timber up to 39 years old, Mr. Granvall "grew" it to age 50 and discounted it to present value, but for timber between 40 and 49 years, he harvested it immediately.  This timber, if held to age 50, would net a higher profit.  We think that a hypothetical buyer would consider this economic opportunity and value the timber accordingly.

Finally, the parties agree that some portion of petitioner's undeveloped land had a higher and better use as something other than timberland; however, they disagree as to the amount of such property.  The parties refer to this "higher and better use" property as transitional, or development, property.

In 1968, petitioner formed Pope & Talbot Development for the purpose of dealing in real estate sales.  Petitioner often sold or contributed property to Pope & Talbot Development that petitioner's management had determined was potentially developable and was more valuable as development property than as timberland.  In 1985, Pope & Talbot Development held approximately 17,000 acres.  The most recent transfer of 13,500

---

[10](...continued)
referred to as "reproduction".  To simplify the comparison of the reports of the two experts, we refer to all premerchantable timber as "reproduction".

acres occurred in June 1984. Pursuant to the plan, petitioner transferred all the property held by Pope & Talbot Development to the Partnership. However, as set forth in the notice and proxy statement that petitioner sent to its shareholders describing the plan, petitioner classified only 4,400 acres of this property as development property; the remainder was classified as timberland.

Respondent's expert, Bruce C. Allen of Bruce C. Allen & Associates, Inc., determined that approximately 11,084 acres (31 parcels) of land held by Pope & Talbot Development had development potential in the reasonably foreseeable future (i.e., 5-10 years).[11] A majority of this property was located in Kitsap and Jefferson Counties. Kitsap County is the more developed of the two counties, with a broad economic base and well-established cities. Jefferson County is more rural with lower values and lower levels of development.

In appraising the land, Mr. Allen utilized a sales comparison approach. He analyzed roughly 200 sales spanning the period from 1981 through 1987. He adjusted the comparable sales for differences in size, location, topography, access, zoning, view, and forested appearance. Mr. Allen opined that due to the generally flat market conditions, only those sales in 1987

---

[11]Most of the acreage Mr. Allen valued was classified as "Timberlands" in petitioner's proxy statement. In the proxy statement, petitioner classified only 4,400 acres of land transferred to Pope Resources as "Development Properties"; 78,300 acres were classified as "Timberlands".

required a time adjustment to 1985.  Mr. Allen assumed that some timber would remain on the subject property because of the difficulty in marketing completely bare, or clear-cut, land.  In cases where the parcels were large and comparable sales were not available, Mr. Allen utilized a development approach.  The approach involved an analysis of the potential segregation of a parcel, less the costs to segregate and sell the lots.  Mr. Allen retained a planning firm specializing in the subdivision of land to assist in the estimation of the development costs.  To the extent that a typical buyer would recognize the value of merchantable timber in excess of a light forested cover, Mr. Allen relied on Mr. Prochnau for the value of such excess timber.

Mr. Allen then applied a bulk discount of 10 percent to the total appraised value of the subject properties to recognize several potentially offsetting factors:  (1) The ability to sell scattered parcels individually, (2) the near-term development potential of property in Kitsap County, (3) the long-term holding prospect of property in Jefferson County, and (4) the moderate activity in Pierce County.  Mr. Allen estimated the total market value of the development properties (after discount) to be $20.9 million.

Petitioner's expert, Byron Slack of National Appraisal Co., determined that approximately 2,000 acres (10 parcels) had development potential.  Mr. Slack utilized a market, or comparable sales, approach to valuing these parcels, making

adjustments to the comparable sales prices where necessary.  One
parcel, however, the Gold Mountain broadcast site, was valued
using an income approach, capitalizing net income at 17
percent.[12]

The parties agree that eight parcels had a higher and better
use than timberland.  A comparison of the estimated values of
these properties is as follows:

| Property | Mr. Allen | Mr. Slack |
|----------|-----------|-----------|
| Bucklin Ridge | $3,600,000 | $2,400,000 |
| Poulsbo 80 | 112,500 | 130,000 |
| Everett | 765,000 | 707,000 |
| Gamblewood | 247,500 | 285,000 |
| Pete's Mountain | 792,000 | 1,247,000 |
| Discovery Bay | 1,080,000 | 623,600 |
| Camano Hill | 180,000 | 246,000 |
| Brown's Point | 558,000 | 697,000 |
| Total | $7,335,000 | $6,335,600 |

Like the market for timberland, the real estate market was
depressed in 1985.  As such, we do not agree with Mr. Allen's
determination that 11,084 acres of real estate held by Pope &
Talbot Development were potentially developable in the reasonably
foreseeable future.  Moreover, we note that upon conversion of
designated forestland into ad valorem property, the owner must
pay a conversion tax equal to the additional amount of tax that
the owner would have paid if the property had been subject to the
ad valorem tax rate for the preceding 10 years.  While this cost

---

[12]Mr. Slack valued the Gold Mountain parcel at $126,500.

is not incurred until actual conversion, we think that a hypothetical buyer would consider this potential cost.  Mr. Allen did not account for conversion costs in his analysis.  Upon consideration of the experts' reports and testimony and other evidence relating to the development potential of the property, we believe that approximately 6,000 acres of the property held by Pope & Talbot Development should be classified as development property having a higher and better use than timberland.

In sum, we have considered each expert's report and testimony with respect to timber, timberland, and development property and have determined that we cannot accept or reject either party's experts in full.  Based upon the record before us and the conclusions we have reached above, we believe that the collective value of the timber and timberland was between $30 and $40 million, and the value of the development property was between $10 and $12 million.

Port Ludlow Community

The Port Ludlow community is a resort and residential development project located in Port Ludlow, Washington, on the Puget Sound.  Prior to the transfer of Port Ludlow to the Partnership, approximately 500 acres of land had been developed, and approximately 750 lots had been sold at prices ranging from $10,000 to $75,000.  As of December 20, 1985, approximately 68 developed lots remained available for sale, and about 2,500

additional acres in the Port Ludlow area were available for future development.[13]  Facilities at the Port Ludlow community include a marina, a full-service restaurant, a convention center, a sales office, and an 18-hole golf course.  In 1985, Village Resorts, Inc., a resort management company, leased these facilities.  The property transferred to the Partnership remained subject to this lease.

By 1984, the wastewater treatment plant at Port Ludlow was operating well in excess of capacity.  The Department of Ecology imposed a moratorium on new sewer hookups until certain interim improvements were made and an expansion plan was approved.  The Department of Ecology dropped the moratorium in May 1985; however, sales of petitioner's existing lots were still not permitted until expansion of the sewer was completed.  In 1985, petitioner estimated that the expansion project would be completed by the end of 1988 at a cost of between $2 and $5 million.  Phase I of the sewer expansion project was completed in 1989 at a cost of approximately $2.5 million.

As a result of the sewer problems, Port Ludlow experienced heavy financial losses and was forced to close the resort during the winter of 1984-1985.

---

[13]The 2,500 acres of undeveloped property were not appraised by the parties' experts in connection with the Port Ludlow community.  Instead, this property was valued either as timberland or development property, which was previously discussed.

Petitioner's expert, Byron Slack, separately valued the developed lots, each resort improvement, and the bare land. He assumed that the most likely buyer would be a timber company who would purchase the resort along with the surrounding timberland. In estimating the value of the developed lots, Mr. Slack utilized a subdivision approach, wherein he capitalized the net income expected to be generated from sales of the lots. First, Mr. Slack estimated the current market value of the lots based on previous lot sales by petitioner in the Port Ludlow area. He then estimated the reasonably expected absorption rate (i.e., the rate and period over which the lots would be sold). Because of the sewer moratorium, Mr. Slack assumed that lot sales would not recommence until 1988. He further estimated that lot sales would average approximately 10 per year from 1988 through 1993 and that the lots would be entirely disposed of in 1994.

Next, Mr. Slack deducted the estimated costs associated with selling the lots. He estimated the costs of sale at 55 percent of the sales price of the lots. These costs would include site preparation, sales costs, property taxes, utilities, and roads. Mr. Slack then estimated an additional cost of $40,000 per year for general overhead, administrative expenses, marketing, supplies, etc. Mr. Slack also apportioned part of the expected costs for the sewer upgrade (which he estimated at a total of $3 million) to the developed lots.

Finally, Mr. Slack capitalized the net income from the lots at a rate of 29.41 percent to arrive at the fair market value of the lots. This capitalization rate has both debt and equity components as well as adjustments for risk and illiquidity.

According to Mr. Slack, the income flow from the lots as determined under this subdivision approach was negative. Thus, Mr. Slack determined that residential use of these lots was not the highest and best use. Rather than consider other potential uses for the lots, Mr. Slack thought that it was more reasonable to estimate the value of the lots at $50 each, or $3,400 total.

In estimating the value of the improvements at Port Ludlow, Mr. Slack utilized a cost approach. He rejected the market approach as a reliable indicator of value because of the lack of good comparable sales. He also rejected the income approach, because there was insufficient data from which to precisely determine revenue and costs. In addition, in most cases, the income approach yielded extremely low or negative values. Mr. Slack utilized the market approach, however, to estimate the value of the land underlying the improvements. Mr. Slack determined the following fair market values for the land and improvements at Port Ludlow:

| Land and Improvement | Value |
|---|---|
| Golf course and related improvements | $1,571,661 |
| Convention center | 117,422 |
| Restaurant, sales office, and | |

| | |
|---|---|
| information center | 1,525,106 |
| Marina and related improvements | 1,314,653 |
| Miscellaneous | 112,194 |
| Total | $4,641,036 |

Finally, Mr. Slack estimated the value of approximately 959 acres of bare, undeveloped land at $2,129,003 using the market approach.  In arriving at this value, Mr. Slack considered the wastewater treatment problems at Port Ludlow to be a particularly significant factor.  Even after the planned sewer expansion project, some of the land would be left without access to the wastewater treatment system.  Moreover, most of the land had soil characteristics that did not allow for on-site sewer systems. Mr. Slack apportioned part of the $3 million expected costs for the sewer upgrade to the bare and improved land.  Mr. Slack also made adjustments to his comparable sales to account for differences in access and view.  No time adjustment was made, however, because land values remained stable in Jefferson County during the time period.

In sum, Mr. Slack estimated the value of the Port Ludlow community, including the developed lots, the undeveloped land, and all the improvements, less total estimated sewer expansion costs of $3 million, at $3,945,000.

Respondent's experts, Christopher K. Monger and Michael F. Griffin of Palmer, Groth & Pietka, Inc., determined that the highest and best use of the property is its current use as a

resort and that the most likely buyer would be a single developer or investor, who would continue to operate it as a resort. Messrs. Monger and Griffin valued the Port Ludlow community in the aggregate as opposed to in bulk (with the exception of the developed lots).  In other words, they summed the values of the individual components, rather than determining the value of the individual components as if offered and sold on the market to a single buyer in one transaction.

In estimating the value of the developed lots, Messrs. Monger and Griffin utilized a sales comparison, or market, approach to arrive at the value of each lot.  They then adjusted the aggregate of these values to arrive at a bulk value.  The bulk value reflects the subject's value if sold as a single entity to one buyer in one transaction, and it reflects the purchaser's acceptance of the marketing risk and holding costs. Messrs. Monger and Griffin assumed an absorption rate of 5 lots per year for the first 2 years increasing gradually up to 25 lots per year (for an overall average of 15 lots per year).  They deducted selling and holding costs equal to approximately 18.5 percent of sales from the aggregate value of the lots.  Then, a total discount of 22 percent (i.e., 12 percent attributable to the time value of money and 10 percent expected profit) was applied to arrive at the bulk value of the lots.  Messrs. Monger and Griffin arrived at a final bulk value of $400,000 for the developed lots.

Messrs. Monger and Griffin estimated the value of the improved portions of Port Ludlow using a cost approach. An income approach was also used for those properties for which there was sufficient revenue and expense data (i.e., the restaurant, marina, and golf course). The sales comparison approach was not considered a reliable value indicator, since individual resort components sell infrequently, and they derive their value mostly in connection with the larger resort property. Messrs. Monger and Griffin utilized the sales comparison approach, however, to estimate the value of the land underlying the improvements. That method is discussed below. Messrs. Monger and Griffin determined the following fair market values for the land and improvements at Port Ludlow:

| Land and Improvement | Value |
|---|---|
| Golf course | $2,350,000 |
| Convention center and sales office | 270,000 |
| Restaurant | 500,000 |
| Marina | 1,080,000 |
| Total | $4,200,000 |

In addition, Messrs. Monger and Griffin utilized the cost approach to estimate the value of certain retail and commercial facilities that were under construction in 1985 at $130,000.

Finally, in estimating the value of the vacant, undeveloped land, Messrs. Monger and Griffin divided the parcels into functional units, or a smaller number of property groups with

similar higher and best uses. They then valued each functional unit by using the comparable sales method. Adjustments were made for size, location, access, topography, view, and access to utilities. No adjustment was made for the time of the comparable sale, because Messrs. Monger and Griffin concluded that land values in Jefferson County remained relatively stable throughout the period. Messrs. Monger and Griffin concluded that the value of the vacant land was $3,670,000.

Messrs. Monger and Griffin deducted $2.15 million from the aggregate values of the individual components as a reserve to cover future estimated sewer expansion costs. They concluded that the Port Ludlow community had fair market value of $6,270,000.

In evaluating the expert opinions with respect to the value of the Port Ludlow community, we found several problems that seem to account for much of the difference between the experts' value conclusions. First, we believe that Mr. Slack overstated the costs associated with the developed lots, thus underestimating the value of the developed lots. Mr. Slack estimated the costs of sale at 55 percent of the sales price of the lots and determined an additional cost of $40,000 per year for general and administrative expenses. We note that petitioner's actual costs of sale for each of the years 1982 through 1985 were approximately 25 percent of the sales price.

Next, we believe that Messrs. Monger and Griffin were inconsistent in determining that the most likely buyer would be a single developer or investor, who would continue to operate the Port Ludlow community as a resort and then apply an aggregate value approach rather than a bulk value. We believe that the bulk value approach that Messrs. Monger and Griffin used to value the developed lots should be extended to the entire resort.

Accounting for these differences and considering all the evidence with respect to the Port Ludlow community, we conclude that the appropriate value for the Port Ludlow community is between $4.2 and $4.7 million.

## Port Gamble Townsite and Tree Nurseries

The Port Gamble townsite, located in Port Gamble, Washington, was founded in 1853. Since then, it has remained a genuine company town and has been designated as a National Historic Landmark. The Port Gamble sawmill is one of the oldest operating sawmills in the United States, and it still remains the employment center and focal point of Port Gamble. Petitioner transferred to the Partnership the land on which the Port Gamble sawmill and related town are located, the town buildings, and the log dump site. Petitioner retained all the physical mill facilities and leased back the land underlying the mill, the log dump site, and the town from the Partnership.

The townsite improvements consist of 35 single-family homes, 1 duplex, and 8 nonresidential buildings, including a country store, company offices, community hall and post office building, Masonic temple, church, gas station, fire hall, and carpenter shop. The town's structures are wood and were built between 1853 and 1929. The style, quality, and condition of these structures vary widely. They lack functional heating systems but have chimney systems for occupants to install wood-burning stoves. Plumbing and electrical fixtures are minimal. Although sufficient spring water was available to supply Port Gamble's needs, the water system was not in compliance with State and Federal regulations in terms of water quality on December 20, 1985. The sewer treatment plant was operating at or above capacity on a regular basis. It was sufficient for existing improvements, but additional development would likely require additional treatment capacity. The homes in Port Gamble were generally rented to mill workers at an average rent of approximately $170 per month, less than the cost to operate the townsite.

Petitioner also transferred to the Partnership the land, buildings, and inventory associated with its Cyrus T. Walker Tree Nursery and its 40-acre Hansville Transplant Nursery. The nurseries grow Douglas fir seedlings for reforestation of cut-over timberlands and have the capacity to produce 2.5 to 3

million seedlings annually.  This seedling production had historically been used to reforest petitioner's timberlands.

Mr. Slack, petitioner's expert, concluded that the structures at Port Gamble were substantially deteriorated and that the townsite had been operating at an ongoing loss. According to Mr. Slack, any alternative use of the Port Gamble townsite land and improvements that would entail additional development or additional use of the existing structures was not financially feasible due primarily to the poor quality and condition of the sewer treatment and water systems and to limitations on potential uses as a result of the historical designation.  As a result, Mr. Slack concluded that the highest and best use of the townsite was to vacate the structures and use the excess land as a tree farm.  Mr. Slack determined that because of the negative income stream produced by the property in its current state and the infeasibility of any alternative uses, the cost and market methods were not appropriate.  Mr. Slack believed that the income approach was the best method, because the houses were all rented, and the property was never subdivided.  Utilizing the income approach, Mr. Slack determined the value of the townsite and related properties to be equal to the salvage value of the improvements plus the value of the land as a tree farm, or $202,000.

Respondent's expert, Christopher S. Eldred of Lamb Hanson Lamb Appraisal Associates, Inc., determined that the highest and

best use of the townsite was reasonably reflected in most instances by its current mixed use.  He believed that the houses were in fair to average condition and assumed separate sales with no additional development.

Mr. Eldred estimated the value of the townsite using a combination of the cost and comparative sales approaches.  In valuing the millsite and log dump property, he used only the comparative sales approach.  Mr. Eldred determined that the income approach was inappropriate, because structures like the subject structures are generally not purchased for the purpose of receiving rental income.  He found that most of the nonresidential buildings, such as the church, fire station, community hall, and Masonic temple, were special purpose facilities for which no meaningful rental, expense, and income data are available.  He believed that the actual rents charged by petitioner in 1985 were not reflective of market rents.

Mr. Eldred determined that the fair market value of the Port Gamble townsite and related properties was as follows:

| Land and Improvement | Value |
|---|---|
| Millsite industrial land | $1,400,000 |
| Log dump property | 770,000 |
| Townsite-residential | 1,952,000 |
| Townsite-nonresidential | 882,000 |
| Total | $5,004,000 |

We agree with Mr. Eldred that the highest and best use of the townsite was its current mixed use and that the income approach was generally inappropriate for the subject property.[14] However, we believe that a couple of factors would result in a lower market value than that determined by Mr. Eldred. First, Mr. Eldred utilized a sales comparison approach to value the millsite as industrial property. The mill itself, however, was still owned by petitioner. Thus, while a hypothetical buyer could purchase the land, it would be severely constrained in its use of the land. Since the land was subject to a 20-year lease in favor of petitioner, we believe that a capitalized income approach would be more appropriate. Next, Mr. Eldred did not factor in any cost with respect to the water system. Although a hypothetical buyer of one of the houses would not incur costs to improve or correct the entire system, we believe that a buyer would consider the problems with the water system and factor it into the price it is willing to pay for the house. Finally, Mr. Eldred did not factor in any selling expenses with respect to the properties, even though he indicated at trial that such costs would probably be approximately 10 percent of the selling price.

---

[14]Mr. Slack subsequently appraised the Port Gamble townsite as of Jan. 1, 1991, and although that appraised value is not controlling for purposes of the present case, we note that in the subsequent appraisal, he, too, concluded that the highest and best use was a historical townsite and that the income approach was inappropriate.

In estimating the value of the nurseries, Mr. Slack determined that an income approach was the best indicator of value. He rejected use of the market approach due to lack of comparable sales. Both nurseries were operating at a continual loss, and the losses were forecasted to continue into the future. Based on these losses and the absence of reasonable and probable alternative uses, Mr. Slack determined that the value of the nurseries was equal to the estimated salvage value of the improvements plus the value of the vacant land. Mr. Slack concluded that the highest and best use of the vacant land was for residential use, as opposed to agricultural use. He also considered the lack of water rights at the Hansville Transplant Nursery to be a limiting factor. Accordingly, Mr. Slack concluded that the fair market value of the Cyrus Walker Nursery was $161,000 and the Hansville Transplant Nursery was $69,631.

Mr. Eldred utilized a cost approach to estimate the values of the nursery improvements, as no comparable sales were discovered, and he used a comparable sales approach to value the land underlying and surrounding the nurseries. In valuing the land, Mr. Eldred assumed a highest and best use as residential property. Mr. Eldred concluded that the fair market value of the Cyrus Walker Nursery was $570,000 and the value of the Hansville Transplant Nursery was $450,000.

We agree with Mr. Eldred that a cost approach is appropriate in valuing the nurseries and that an income approach artificially

undervalues them. The evidence indicates that petitioner operated these nurseries for the purpose of providing seedlings to petitioner for reforestation. We believe that the most likely buyer would be the owner of a tree farm and similarly operate the nurseries as a source of supply rather than a profit center.

After considering the above factors and the other evidence before us, we conclude that the value of the Port Gamble townsite and related properties (including the nurseries) was between $2.5 and $3 million.

In sum, we have reviewed the voluminous valuation evidence with respect to the individual assets, introduced through both the testimony and reports of seven different experts. All the experts were qualified, but we are aware of the bias reflected in their assessments. Given the vastly disparate values assigned to the various assets by each party's experts, we have narrowed these values to a reasonable range of values based upon all the evidence. Our valuation ranges are as follows:

| Asset | Approximate Fair Market Value |
|---|---|
| Timber & timberland | $30-40 million |
| Development property | 10-12 million |
| Port Ludlow community | 4.2-4.7 million |
| Port Gamble townsite and tree nurseries | 2.5-3 million |
| Total | $46.7-59.7 million |

Valuation by Reference to the Partnership Units

The partnership units were publicly traded on the Pacific Stock Exchange.  There were approximately 1.2 million partnership units outstanding.  During the first 20 days following commencement of "when issued" trading, the aggregate trading volume was 116,892 units, or 9.7 percent of the number of units outstanding, and the weighted average trading price of the units was approximately $11.50 per unit.

Petitioner argues that the value of the Washington assets held by the Partnership must be determined by reference to the partnership unit prices set by the market.  Thus, according to petitioner, the Partnership's assets had an aggregate fair market value on December 20, 1985, of approximately $41.5 million based on the sum of (1) the aggregate public trading price of the units (i.e., 1.2 million units x $11.50 per unit, or $13.8 million) and (2) the initial indebtedness of the Partnership ($27.7 million). Furthermore, petitioner argues that the unit price does not represent a discount from the liquidation value of the partnership, because with a publicly traded company, there is no difference between the aggregate trading value of the units and the amount produced by subtracting the entity's liabilities from the fair market value of its individual assets.

To support its position, petitioner introduced the reports and testimony of two expert witnesses, Professor Michael Bradley,

who holds a chair professorship at the Fuqua School of Business at Duke University and a joint appointment at the Duke Law School, and Gilbert E. Matthews of Bear, Stearns & Co.

Professor Bradley described the Efficient Market Hypothesis, which provides that, in an efficient capital market, security prices constitute unbiased estimates of the value of the underlying assets. More specifically, security prices are unbiased estimates of the value of the future cash-flows that will accrue to the holder of that security, and the ultimate source of these cash-flows is the productivity of the underlying assets. Professor Bradley determined that the units were efficiently valued by the market as evidenced by the relationship between the pricing of the units and the Douglas fir stumpage prices. He noted that the $4.5 million decrease in the aggregate market value of petitioner's stock on the exdividend date[15] confirmed the efficiency of the market's valuation of the Partnership.[16] Professor Bradley concluded that the market price

---

[15]"Exdividend" refers to the situation where a dividend has been declared but not paid. When stock is sold exdividend, the seller, and not the buyer, has the right to the next dividend.

[16]Professor Bradley attributed the difference between the observed $4.5 million decrease and the $13.8 million aggregate value of the partnership units to the "wealth effect of spinoffs". According to Professor Bradley, there are two explanations for this effect. First, a spinoff may lead to better valuation of each entity, because the two businesses may be followed by different analysts and may attract different investors. In addition, transaction costs may provide incentives for sellers to sell their stock before the exdividend date and

(continued...)

of the units fairly represented the value of the underlying assets of the Partnership and that any potential control premium that may have been associated with the units was incorporated in the market price of the units. Mr. Matthews generally supported Professor Bradley.

Respondent, on the other hand, argues that the trading value of the partnership units is irrelevant in determining the value of the assets in petitioner's hands. Respondent contends that the Efficient Market Hypothesis relates to the valuation of an entity's securities, not the underlying assets, and that in the timber industry, the value of an entity's assets will greatly exceed its trading value because of the long time period it takes to generate cash-flows.

We disagree with respondent that the trading value of the units is irrelevant to a determination of the value of the underlying assets. However, we do not accept petitioner's contention that the aggregate value of the partnership units at the $11.50 trading price should be used to mathematically determine the value of the partnership's assets.[17]

---

[16](...continued)
for buyers to wait until after the exdividend date.

[17]Petitioner argues that two prior Tax Court opinions stand for the proposition that when valuing the assets of a publicly traded company, there is no difference between the freely traded minority stock value and the value of the underlying assets. Philip Morris, Inc. and Consol. Subs. v. Commissioner, 96 T.C. 606 (1991), affd. without published opinion 970 F.2d 897 (2d Cir.
(continued...)

A minority discount reflects a minority shareholder's inability to compel liquidation and realize a pro rata share of the net asset value.  Estate of Jung v. Commissioner, 101 T.C. 412, 434 (1993); Harwood v. Commissioner, 82 T.C. 239, 267 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986).  Generally, the trading price of securities in a free and active market represents the value of marketable minority

---

[17](...continued)
1992); Estate of Brownell v. Commissioner, T.C. Memo. 1982-632. We disagree.

In Philip Morris, Inc. and Consol. Subs. v. Commissioner, supra, Philip Morris, Inc., acquired the stock of Seven-Up Co. through its wholly owned subsidiary.  We were called on to determine the value of the intangible assets of Seven-Up Co.  In doing so, we determined that the residual method was inappropriate, because a control premium had been paid.  We noted that the control premium represented a payment for voting control, over and above the value attributable to the underlying assets.  We concluded that the amount of the control premium was the price paid in excess of the trading price prior to the announcement of the acquisition.  Id. at 628-632.  We found that Philip Morris, Inc., was an over-anxious purchaser who had not obtained adequate information about Seven-Up Co. or conducted a due diligence investigation of Seven-Up Co.  However, we went on to value the intangibles using the excess earnings approach, which yielded a value slightly different from the aggregate trading value.  Although we used the aggregate trading value to validate the reasonableness of our determination under the excess earnings approach, we did not hold that the aggregate trading value was determinative of the aggregate value of the underlying assets.  Id. at 638-639.

In Estate of Brownell v. Commissioner, supra, we were called on to determine the value of unregistered stock of Pope & Talbot, Inc., for estate tax purposes.  We did not determine the value of the underlying assets and expressed no opinion as to the relationship between the trading value of the stock and the value of the underlying assets.  Accordingly, we find this case inapposite.

interests.  Estate of Jung v. Commissioner, supra at 442-443
n.11.  Limited partnership interests may be analogized to a stock
interest in this respect.  Harwood v. Commissioner, supra.
Similarly, courts have recognized a fractional interest discount
in valuing undivided interests, particularly when valuing real
property.  Estate of Bonner v. United States, 84 F.3d 196, 197-
198 (5th Cir. 1996); Estate of Fawcett v. Commissioner, 64 T.C.
889, 900-901 (1975).  The discount is an acknowledgment of the
restrictions on sale or transfer of property, when more than one
individual or entity holds undivided fractional interests.
Estate of Bonner v. United States, supra; Estate of Fawcett v.
Commissioner, supra.

We believe that such a discount was reflected in the trading
price of the partnership units.  The units that were being traded
were limited partnership units.  Limited partners in the
Partnership had no management power, limited voting rights, and
significant limitations on their power to remove the managing
general partner.  Moreover, the units were newly issued.  The
value of the assets that had just been transferred to the
Partnership was uncertain as evidenced by the large variance in
the values assigned to them by the various experts in this
case.[18]  In addition, most of the underlying assets consisted of

---

[18]This uncertainty is also reflected in the value estimates
that were made for petitioner prior to transferring the
Washington properties.

timberland and other real property, which generally take a long time to generate cash-flows.[19]

We recognize that our previously stated value range for the specific Washington properties is significantly greater than the asset value that one would arrive at through petitioner's mathematical use of the trading price of the partnership units. On the other hand, as indicated above, we believe that the market price of the partnership units is relevant to our ultimate determination. Taking this into consideration, we conclude that figures in the lower range of our approximate valuations are a better indication of true value. Based upon all the evidence, we

---

[19]The Washington properties were transferred to the Partnership because petitioner's board believed that the market value of the properties was not fully reflected in the trading price of petitioner's stock. At trial, when petitioner's chief executive officer was asked if he believed that the market value of the properties had been fully reflected in the trading price of petitioner's stock, he stated:

I think that the market value is reflected in the price, just like Weyerhaeuser. You know it's like saying, the timber value in Weyerhaeuser is reflected in its market value. It is reflected in the market value. But if you were to take the timber value of Weyerhaeuser and appraise it, it would be greatly in excess of the market value of Weyerhaeuser. And so why is that the case? The cash-flows in timberland, you know, take many, many years to turn out. And so that-- and the returns on timber are very low. They don't-- timber only grows about five percent a year. So the values in this, in our industry, in any of our publicly traded companies, if you appraise the timberland, it's going to appraise higher than the market value of the stock. So this is sort of a general statement that you would make about any company in our industry.

conclude that the Washington properties had the following fair market values on December 20, 1985:

|  |  |
|---|---|
| Timberland | $31.0 million |
| Development | 10.5 million |
| Port Ludlow | 4.5 million |
| Port Gamble | 2.5 million |
|  | $48.5 million |

## Deductibility of Expenses

The next issue we must decide is whether petitioner may offset certain expenses incurred in connection with the distribution against its section 311(d) gain.  In 1985, petitioner incurred $1,364,071 of legal, accounting, investment banking, and other fees relating to the formation of the Partnership, the transfer of the Washington properties, and the distribution of the partnership units.  Petitioner agrees that these expenses are capital in nature and, therefore, not deductible under section 162.  Rather, petitioner argues that such sales expenses may be used to offset its gain on the taxable distribution.

It is well settled that costs connected with the sale of a capital asset are capital expenditures to be used to offset against the sales price.  Woodward v. Commissioner, 397 U.S. 572, 576 (1970); Kirschenmann v. Commissioner, 488 F.2d 270, 273 (9th Cir. 1973), revg. 57 T.C. 524 (1972); Spangler v. Commissioner, 323 F.2d 913, 921 (9th Cir. 1963), affg. T.C. Memo. 1961-341;

Davis v. Commissioner, 151 F.2d 441 (8th Cir. 1945), affg. 4 T.C. 329 (1944); Stokely-Van Camp, Inc. v. United States, 21 Cl. Ct. 731, 753, (1990), affd. 974 F.2d 1319 (Fed. Cir. 1992).

Section 311(d)(1) provides that if a corporation distributes appreciated property to a shareholder, then gain shall be recognized as if the property distributed had been sold at the time of the distribution. See also Pope & Talbot, Inc., & Subs. v. Commissioner, 104 T.C. 574 (1995). Thus, where appreciated assets are distributed by a corporation, section 311(d)(1) treats such a distribution as a deemed sale. We see no reason why transaction costs should be treated differently in a deemed sale than they are in an actual sale. Accordingly, we hold that petitioner may offset its expenses incurred in connection with the distribution against its section 311(d) gain.

The next issue is whether petitioner may deduct investment banking fees for advice regarding potential hostile takeovers under section 162. Petitioner retained Bear, Stearns & Co. (Bear Stearns) in October 1984 to advise its board of directors regarding potential unfriendly proposals to purchase the company. Pursuant to this arrangement, Bear Stearns agreed to review petitioner's strategies, financial position, charter documents, etc., in order to obtain a level of understanding that would allow Bear Stearns to evaluate instantly any future proposal to acquire petitioner, as well as recommend any changes that would strengthen management's negotiating position in such an event.

Petitioner paid Bear Stearns $89,788.08 in 1985 and $66,195.92 in 1986 with respect to this advice.  No takeover was ever threatened or attempted.

Section 162(a) permits taxpayers to deduct all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.  An expense is ordinary if it is of common or frequent occurrence in the type of business involved.  Deputy v. du Pont, 308 U.S. 488, 495 (1940); Welch v. Helvering, 290 U.S. 111, 114 (1933).  An expense is necessary if it is appropriate or helpful to the development of the taxpayer's business.  Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Welch v. Helvering, supra.

In contrast, section 263(a)(1) disallows a deduction for capital expenditures.  Expenditures that give rise to a long-term benefit or are incurred for the purpose of changing the corporate structure are capital expenditures.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992); A.E. Staley Manufacturing Co. v. Commissioner, 105 T.C. 166 (1995).  In determining whether fees paid for business advice and counsel are capital, we look to the nature of the services performed by the adviser rather than their designation or treatment by the taxpayer.  Honodel v. Commissioner, 76 T.C. 351, 365 (1981), affd. 722 F.2d 1462 (9th Cir. 1984); Cagle v. Commissioner, 63 T.C. 86, 96 (1974), affd. 539 F.2d 409 (5th Cir. 1976).  Our inquiry thus focuses on whether the services were performed in the process of giving

business advice or whether the services were performed in the process of effecting a change in corporate structure for the benefit of future operations. <u>INDOPCO, Inc. v. Commissioner</u>, <u>supra</u> at 89; <u>Honodel v. Commissioner</u>, <u>supra</u>.

In the present case, the nature of the services performed by Bear Stearns was business planning or advice. The amounts paid to Bear Stearns did not result in any change in corporate structure or long-term benefit. We believe that this case differs from <u>INDOPCO, Inc. v. Commissioner</u>, <u>supra</u> and <u>A.E. Staley Manufacturing Co. v. Commissioner</u>, <u>supra</u>, both of which involved acquisitions of the corporate taxpayer's stock that gave rise to long-term benefits. Here, no acquisition or takeover was ever threatened or attempted. Accordingly, we hold that the fees petitioner paid to Bear Stearns were not capital expenditures and, therefore, are deductible pursuant to section 162(a).

The final issue is whether petitioner may deduct fees paid to Depository Trust Co. in connection with holding petitioner's stock "in street name" pursuant to section 162(a). Petitioner has introduced no evidence regarding the specific nature or purpose for this expenditure. Therefore, we find that petitioner has not met its burden of proving that it is entitled to a deduction under section 162, and we uphold respondent's determination that the expenditure must be capitalized.

<u>Decision will be entered</u>

<u>under Rule 155</u>.